**FEDERAL INSURANCE CO., Plaintiff–Counter Defendant–Appellee,**

v.

**Sudhir SRIVASTAVA, M.D., et al., Defendants–Counter Claimants–Appellants.**

No. 92–8342.

United States Court of Appeals, Fifth Circuit.

Sept. 3, 1993.

Rehearing Denied Oct. 18, 1993.

James L. Branton, Franklin S. Spears, Branton & Hall, San Antonio, TX, for S. Srivastava.

D. Thomas Johnson, Brian P. Quinn, McWhorter, Cobb & Johnson, Lubbock, TX, Russell H. McMains, Stacy L. Keaton, Law Offices of Russell H. McMains, Corpus Christi, TX, for Harte–Hanks T.V. and Harte–Hanks Comm.

Brian L. Blakeley, Ruth Greenfield Malinas, Ball & Weed, San Antonio, TX, for Federal Ins. Co.

Before GOLDBERG, HIGGINBOTHAM, and DAVIS, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

This case involves the efforts of insureds and judgment creditors to allocate excess coverage to bridge the failure of carriers with intervening coverages to reach a solvent, but higher level, insurer—all after the entry of a large judgment against the insured. In a previous lawsuit, Dr. Sudhir Srivastava won a $31.6 million judgment against Harte–Hanks Television, Inc., and Harte–Hanks Communications, Inc. Those parties, co-appellants here, reached an accord among themselves and some insurers of Harte–Hanks. Federal Insurance Co., the final excess policy carrier, did not participate in that agreement and brought this declaratory judgment action to determine its liability. The district court held that Federal was not liable where the amount actually paid by the insured and underlying carriers did not reach Federal's layer of excess coverage, and that Harte–Hanks did not act as a prudent uninsured in settling the controversy. We affirm.

I

Srivastava sued Harte–Hanks Television and its parent, Harte–Hanks Communications, for defamation and invasion of privacy following a series of television broadcasts in 1985 that questioned Srivastava's professional competence. On April 10, 1990, a Bexar County jury awarded Srivastava $11.5 million in actual and $17.5 million in exemplary damages. The trial court entered a judgment, including prejudgment interest, for $31,597,201. On or about April 12, Harte–Hanks informed Federal, the carrier of its highest layer of excess insurance, of the verdict.

Harte–Hanks had several layers of insurance protection. Continental Casualty Company provided $2 million of primary insurance coverage. Mission Insurance Company and Western Insurance Company provided the next two layers of coverage, with policies covering an additional $10 million of loss. Columbia Casualty Company[1] and Hudson Insurance Company jointly provided another $10 million layer. The final layer of excess coverage, for losses in excess of $22 million, was provided by Federal. These layers of coverage are summarized by the following table:

| Insurer | amount of coverage | layer of coverage |
|---|---|---|
| Continental | $ 2 million | $ 0–$2 million (primary) |
| Mission* | $ 5 million | $ 2–7 million |
| Western* | $ 5 million | $ 7–12 million |
| Columbia/Hudson | $10 million | $12–22 million |
| Federal | $30 million | $22–52 million |

1. This firm is now known as Commercial Union Insurance Company.

The second and third layers of insurance, however, proved hollow. Mission and Western are insolvent, a major cause of the controversy now presented.

Three provisions of Federal's excess liability policy appear to be relevant. The policy's coverage language stated:

> [Federal] agrees to pay on behalf of the insured LOSS resulting from any occurrence insured by the terms and provisions of the First UNDERLYING INSURANCE policy.... The insurance afforded by this policy shall apply only in excess of and after all UNDERLYING INSURANCE ... has been exhausted.

The policy defined a "LOSS" as:

> the amount of the principal sum, award or verdict, actually paid or payable in cash in the settlement or satisfaction of claim for which the Insured is liable, either by adjudication or compromise with the written consent of [Federal]....

Finally, the following provision governed Federal's obligation to pay: "Upon final determination of LOSS, [Federal] promptly shall pay on behalf of the insured the amount of LOSS falling within the terms of this policy."

After the judgment in favor of Srivastava, Harte–Hanks requested each of its solvent insurers to participate in an appeal of the judgment and to post part of the supersedeas bond. The insurers hesitated, however, noting potential coverage issues. The major concern involved responsibility for the $10 million gap in coverage caused by the insolvencies of Mission and Western. Also, Federal expressed concern about late notice to it of Srivastava's claim. Nonetheless, to prevent the execution of the trial court judgment, Federal, Continental, Columbia/Hudson, and Harte–Hanks executed an "Agreement Regarding Appeal."

The Agreement recited that each party "is dissatisfied with the judgment, wishes to appeal the Judgment, and elects to participate in the appeal of the Judgment." It stipulated, however, that it "does not alter the Parties' obligations, if any, regarding the prosecution of an appeal except as expressly stated." At the same time, the Agreement preserved all reservations of rights regarding coverage issues, being "made without prejudice to each of the Parties' respective contentions vis-a-vis each other...." Each party agreed to contribute to the supersedeas bond. Federal agreed to act as surety for $18 million, including the portion of the judgment in excess of $22 million plus post-judgment interest on the entire judgment. Harte–Hanks then perfected its appeal in state court.

Before briefs were filed in the court of appeals, Srivastava initiated settlement negotiations. All of the insurers were invited to participate. Srivastava opened with an offer to accept $21 million for the entire judgment. Federal responded that this demand was below its layer of coverage. Federal requested that Harte–Hanks and the underlying insurers make a good faith effort to settle within the underlying policy limits. Federal itself declined to participate in negotiations. Harte–Hanks nonetheless urged Federal to contribute to a settlement. Federal viewed this as a demand that Federal drop down in place of the insolvent carriers, and refused.

Despite Federal's absence from the bargaining table, the negotiators did not consider Federal "off the hook." They agreed to only a partial settlement, which would not extinguish the entire $31.6 million judgment. In exchange for a total payment of $8.5 million from Harte–Hanks, Continental, and Columbia/Hudson, Srivastava agreed to release Harte–Hanks' liability for the first $22 million of the judgment.[2] The partial settle-

---

2. Under this settlement, Continental agreed to pay $2.1 million and Harte–Hanks to pay $1 million to extinguish the first $7 million in liabili-

ty. Harte–Hanks agreed to pay $2.4 million more to extinguish the next $5 million in liability. Finally, Columbia/Hudson agreed to pay $3

ment agreement provided that "all rights of actual recovery under the existing Judgment or any future judgment ... by [Srivastava] against [Harte–Hanks] will be satisfied by collection from the upper-most carrier involved in the present controversy, [Federal] ...." Thus, Srivastava would receive $8.5 million from the settling parties and retain the right to collect the remainder of the judgment—more than $9 million—from Federal.

By settling, Harte–Hanks believed that it had fixed its liability and so lost interest in prosecuting the appeal. By the settlement, Federal would remain liable if the judgment were enforceable. Federal demanded that Harte–Hanks continue to prosecute the appeal. Harte–Hanks responded that it would not dismiss the appeal if Federal would substitute its own counsel and unequivocally acknowledge its obligation to pay the amount of an affirmed judgment in excess of $22 million. Federal construed this as a demand to waive the reservation of rights, in violation of the Agreement Regarding Appeal, and refused.[3]

As a result of the partial settlement, Harte–Hanks dismissed its appeal of the $31.6 million judgment.[4] The supersedeas bond had been modified on motion of the settling parties in March, and all parties agreed to terminate the bond on April 25, 1991.

On that day, Federal filed this declaratory judgment action, resting jurisdiction on diversity of citizenship. After a bench trial, the district court held that Federal was not obligated to pay the judgment, because (1) the partial settlement agreement did not exhaust the underlying insurance coverage, as required by Federal's excess policy; and (2) Federal was not bound by the settlement because Harte–Hanks did not act as a prudent uninsured by settling on these terms. The court also found that Harte–Hanks breached the Agreement Regarding Appeal

by dismissing the appeal; thus, "Federal rightfully chose not to participate in the Partial Settlement Agreement." Finally, the court rejected counterclaims that Federal breached duties of good faith and fair dealing due Harte–Hanks. Harte–Hanks and Srivastava appealed.

## II

As an excess policy carrier, Federal accepted the risk that Harte–Hanks would suffer a loss that exhausted the underlying insurance policies. We must determine the meaning, under the policy, of exhaustion and loss.

■ Texas law governs this diversity case. In construing insurance policies, we must favor the insured when the language of the policy is susceptible to more than one reasonable interpretation. *Ramsay v. Maryland Am. Gen. Ins. Co.*, 533 S.W.2d 344, 349 (Tex. 1976). "Of course, when the language of the policy permits only one reasonable construction and that construction favors the insurance company, recovery is denied." *Ideal Mut. Ins. Co. v. Last Days Evangelical Ass'n, Inc.*, 783 F.2d 1234, 1238 (5th Cir. 1986) (citing *Puckett v. U.S. Fire Ins. Co.*, 678 S.W.2d 936, 938 (Tex.1984)). When policy terms are not ambiguous, they are "given their plain, ordinary and generally accepted meaning unless the instrument itself shows that the terms have been used in a technical or different sense." *Ramsay*, 533 S.W.2d at 346. " '[C]ourts will not so construe plain language as to make a contract embrace that which it was intended not to include.' " *Royal Indem. Co. v. Marshall*, 388 S.W.2d 176, 181 (Tex.1965) (quoting *British America Assurance Co. v. Miller*, 44 S.W. 60, 62 (Tex. 1898)).

"Excess liability insurers contract to provide inexpensive insurance with high policy limits by requiring the insured to contract for primary insurance with another carrier."

---

million to extinguish the liability between $12 million and $22 million. Thus, Srivastava would receive $8.5 million in satisfaction of the first $22 million of the judgment.

**3.** Federal declined to substitute its own counsel, but offered to pay attorney's fees subject to an

arbitration of its liability for them, referring to the arbitration clause of the Agreement.

**4.** The Texas Fourth Court of Appeals granted this dismissal on May 15, 1991.

*Harville v. Twin City Fire Ins. Co.*, 885 F.2d 276, 278 (5th Cir.1989). In this case, the bargained-for policy with Federal also required that Harte–Hanks maintain several underlying layers of excess coverage. Federal contemplated the risk—since actualized—that a jury would award damages against Harte–Hanks in excess of $22 million. We must be careful not to shift contracted-for risks. *See id.* at 279.

Our first task is to locate the starting point of Federal's coverage layer. An excess policy's coverage usually begins when all of the underlying insurers have exhausted their policies by paying to their policy limits. Thus, Federal's policy states that it shall apply only "after all UNDERLYING INSURANCE ... has been exhausted." Here, there are two large complications. The first is that two of the underlying insurance carriers are insolvent. The other is that, while a judgment in excess of the policy limits of the underlying policies was awarded against the insured, a portion of the judgment equalling their limits was extinguished by settlement at a substantial discount.

■ Mission and Western were to provide coverage for losses between $2 million and $12 million. Under Texas law, their insolvencies cannot cause Federal to assume coverage for the resulting gap in coverage. Texas courts do not require excess insurers to "drop down" in the place of insolvent primary carriers. *See, e.g., Emscor, Inc. v. Alliance Ins. Group*, 804 S.W.2d 195 (Tex. App.—Houston [14th Dist.] 1991, no writ). Likewise, in cases arising in Texas and Louisiana, we have found no duty to drop down. *See e.g., Harville*, 885 F.2d at 278; *Steve D. Thompson Trucking v. Twin City Fire Ins. Co.*, 832 F.2d 309 (5th Cir.1987); *Mission Nat'l Ins. Co. v. Duke Transp. Co.*, 792 F.2d 550 (5th Cir.1986); *Continental Marble & Granite v. Canal Ins. Co.*, 785 F.2d 1258 (5th Cir.1986). These holdings do not control this policy, but offer a powerful guide to the reading of policy language. *Harville*, 885 F.2d at 278. We are not the first court to consider a Federal Insurance Co. policy with these terms. The Seventh Circuit has done so, and concluded that the policy unambiguously denied any obligation to drop down.

*New Process Baking Co. v. Federal Ins. Co.*, 923 F.2d 62, 63 (7th Cir.1991). According to *New Process*, the insolvency of an underlying carrier, by itself, has no effect on where the layer of excess coverage begins.

■ Since Federal has no duty to drop down in place of Mission and Western, we conclude that its coverage begins when a loss exceeds the policy limits of all underlying policies. Here, the layer of coverage begins when a loss exceeds $22 million. The coverage layer begins there regardless of whether the underlying insurers actually pay those policy limits. This does not complete the matter. We must determine whether the loss, as defined by the policy, reached that layer of coverage. The amounts payable by underlying insurers will be relevant to that determination in this case.

Here, the underlying insurers, and the insured itself, have agreed to a payment. Their partial settlement, however, does not provide a payment that is equal to the policy limits of the underlying insurance policies. Nonetheless, appellants argue that their payments have exhausted the underlying policies. According to them, the effect of the partial settlement is to extinguish a judgment obligation equal to those policies.

Appellants rely upon a sixty-five-year old Second Circuit decision, holding that actual payment of underlying policies is not required in order to exhaust them and trigger excess coverage. *See Zeig v. Massachusetts Bonding & Ins. Co.*, 23 F.2d 665 (2d Cir. 1928). In *Zeig*, the insured had primary burglary policies totalling $15,000 in coverage, plus an excess policy. The insured settled claims against the primary policies for $6,000. The excess carrier disputed its liability, because the underlying insurers had not paid the insured their policy limits. Judge Augustus Hand wrote:

> The [excess carrier] argues that it was necessary for the [insured] actually to collect the full amount of the policies for $15,000, in order to "exhaust" that insurance.... But the [insurer] had no rational interest in whether the insured *collected* the full amount of the primaries policies, so long as it was only called upon to pay such

portion of the loss as was in excess of the limits of those policies.

> ... The clause provides only that [the primary insurance] be "exhausted in the payment of claims to the full amount of the express limits." The claims are paid to the full amount of the policies, if they are settled and discharged, and the primary insurance is thereby exhausted.... [The word "payment"] often is used as meaning the satisfaction of a claim by compromise, or in other ways.... Only such portion of the loss as exceeded, not the cash settlement, but the limits of these policies, is covered by the excess policy.

*Id.* at 666.

As expressed in the last sentence of the quote, Judge Hand assumed that the insured's *loss* was fixed before any settlement with the primary insurers. With the loss set, there was little danger that primary insurers could, contrary to the contracted-for risk, shift any part of their burden to excess carriers. With a burglary of property, the insured loss was established. A defendant may liken a judgment on a jury verdict to burglary or robbery—fashionable hyperbole. Yet, the insured defendant has not realized a loss.

[redacted] Appellants argue that the loss occurred when the trial court entered its judgment for $31.6 million. They contend that entry of the judgment established an amount payable in cash, an amount exceeding the threshold of Federal's layer of coverage. This reading of the policy is untenable. The policy requires Federal to pay "[u]pon final determination of loss." A trial court judgment on appeal with execution suspended by supersedeas is not a final determination of loss under the policy. We conclude that a loss occurred when the state court of appeals issued the mandate following the dismissal of the appeal, after the partial settlement. At that time, there was a fixed amount "payable in cash."

When the supersedeas bond was terminated, the judgment had been partially extinguished by settlement. We are not persuaded that the nominal value of the extinguished portion of the judgment establishes the loss. Rather, Harte-Hanks' loss is determined by the actual value of the settlement with Srivastava—which includes both the amounts payable by the settling parties and the unextinguished portion of the judgment. That loss does not reach the threshold of Federal's excess policy.[5]

Since the insured's loss does not reach the layer of Federal's coverage, Federal has no liability. We do not address Federal's alternative argument that it may challenge the reasonableness of the partial settlement.

[redacted] Finally, we affirm the district court's holding that Federal did not violate the insurer's duty of good faith and fair dealing under Texas law. Federal had a reasonable basis for refusing to participate in the settlement with Srivastava. While the absence of policy coverage does not foreclose recovery for the breach of the duty of good faith and fair dealing, Federal's decisions were supported by reasonable bases at the time they were made. *See generally Harbor Ins. Co. v. Urban Const. Co.*, 990 F.2d 195, 202 (5th Cir.1993).

AFFIRMED.

[redacted]

5. This does not mean that underlying insurers must actually pay before excess policies are triggered. It means that their obligation to do so must be finally determined. Nor need we pause here to treat the issue of what portion of the judgment is actually unextinguished.