**WESTCHESTER FIRE INSURANCE,**
Plaintiff,

v.

**HEDDINGTON INSURANCE
LTD., et al., Defendants.**

Civ. A. No. 94–1742.

United States District Court,
S.D. Texas,
Houston Division.

April 17, 1995.

Robert C. Floyd, Floyd Taylor & Riley, Houston, TX, for plaintiff.

Joe G. Roady, Sheinfeld Maley & Kay, Houston, TX, for defendants.

## ORDER

HITTNER, District Judge.

Pending before the Court is the motion for summary judgment filed by plaintiff Westchester Fire Insurance Company ("Westchester"), and the motions for partial summary judgment filed by defendants Heddington Insurance Limited ("Heddington"), Texaco, Inc. ("Texaco") and Texaco Refining and Marketing Inc. ("TRMI"). Having considered the motions, the submissions on file, and the applicable law, the Court determines that the defendants' motions for summary judgment should be granted[1] and Westchester's motion should be denied.

This case requires the Court to determine the order, or priority, of liability among insurance carriers with respect to a $19,000,000 settlement of a products liability claim. Texaco contracted with Saturn to supply anti-freeze for use in Saturn Corporation ("Saturn") automobiles. Saturn anti-freeze orders were filled with anti-freeze manufactured by Lubripac—a general partnership engaged in the manufacture of lubricants, in which Texaco Refining and Marketing Inc. ("TRMI") is a two-thirds partner, and Rosewood Lubricants Inc. ("Rosewood") is a one-third partner. Saturn brought a claim against Lubri-

pac, alleging that anti-freeze shipped to Saturn on March 25, 1991 and incorporated into new Saturn automobiles did not meet Saturn's specifications, and as a result, damaged the automobiles. After investigations and negotiations, the various insurers settled Saturn's claim for $19,000,000. Lubripac, TRMI, and Rosewood executed a Mutual Release Agreement which released one another, as well as their insurers, from any and all claims attributable to the Saturn claim. In addition, Saturn, General Motors, Lubripac, TRMI, and Rosewood executed a Release and Indemnification Agreement containing a clause whereby the parties agreed that any net salvage value received from the disposition of the allegedly damaged automobiles would be shared between Saturn and TRMI/Lubripac.

■ The relevant insurance policies at issue are:

*Primary Insurance:* $1,000,000 policy with Travelers.[2]

*Umbrella Insurance:* $10,000,000 policy with International Insurance Company ("International"), *excess* of the Travelers policy and specifying the Travelers policy as an underlying limit.[3]

*Excess Insurance:* (1) $20,000,000 products liability policy (policy number L–189) with Heddington Insurance Ltd. ("Heddington"), specifying a $10,000,000 underlying limit.[4]

(2) $20,000,000 combined coverage policy (policy number L–185) with Heddington, specifying a $10,000,000 underlying limit.[5]

(3) $50,000,000 policy with J.H. Blades and others, *excess* of an underlying limit

---

1. Defendant Heddington filed two motions for summary judgment in this matter. In light of the second motion, the Court determines that Heddington's first motion is moot.

2. This policy listed Lubripac as the insured.

3. This policy listed Lubripac as the named insured.

4. This policy lists Texaco and subsidiaries as named insureds. Heddington is Texaco's captive insurer. A captive insurance company is "orga-

nized for the purpose of insuring the liabilities of its owner." *Clougherty Packing Co. v. Commissioner of Internal Revenue,* 811 F.2d 1297, 1298 n. 1 (9th Cir.1987). In some cases, the insured is both the sole shareholder and only customer of the insurer; whereas, in other cases, the insured may own less than 100% of the insurer. *Id.*

5. This policy lists TRMI and subsidiaries as named insureds.

of $11,000,000.[6]

The insurers paid the $19,000,000 settlement in the following order:

| | |
|---|---|
| Travellers | $ 1,000,000 |
| International | $10,000,000 |
| Blades, et al | $ 1,950,000 |
| Heddington | $ 6,050,000 |

A $968,763.00 salvage value was realized from the damaged autos, and the proceeds were split evenly. Half went to Saturn, and half went to Heddington and Blades. International received none of the salvage value proceeds.

Westchester, succeeding to the rights of International, filed suit against Heddington, Texaco, and TRMI, arguing that International's umbrella coverage should have been applied in excess of all other policies and self-insurance. Consequently, Westchester seeks: (1) reimbursement for the $10,000,000 International paid toward the Saturn settlement; and (2) reimbursement for a proportionate share of the recovered salvage value.

Westchester claims the Heddington policies should apply to the $1,000,000 to $10,000,000 layer of risk before the $10,000,000 International umbrella policy because the Heddington products liability policy was intended to be primary, rather than excess coverage. In the alternative, Westchester claims that TRMI and Texaco failed to maintain $10,000,000 underlying insurance required under the Heddington policies, and thus, Texaco and TRMI's $10,000,000 layer of self-insurance should apply before International's umbrella coverage.

Defendants Heddington, Texaco and TRMI argue that the Mutual Release Agreement executed between TRMI, Lubripac and Rosewood cuts off Westchester's claims to reapportionment of the Saturn settlement.[7] Moreover, the defendants contend Westchester is not entitled to reimbursement for settlement monies or salvage values because the

respective policies were applied in the correct order. The defendants argue International's $10,000,000 umbrella policy was properly applied prior to Heddington's policies because the Heddington policies were pure excess policies which did not apply to losses below $10,000,000. Texaco and TRMI further claim their $1,000,000 to $10,000,000 self-insured layer of coverage could not have been called upon to apply to the Saturn claim because International's umbrella policy insured that layer of risk, and because the Heddington policies did not require Texaco or TRMI to provide underlying insurance.

Thus, the Court is first asked to determine whether the Mutual Release Agreement cut off Westchester's claims. Additionally, the Court must determine the order of liability among the policies and self-insuring agreements.

Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Initially, the movant bears the burden of demonstrating to the court that there is an absence of a genuine issue as to any material fact. *Id.* at 323, 106 S.Ct. at 2552–53. The burden then shifts to the party who bears the burden of proof on the claim on which summary judgment is sought, to present evidence beyond the pleadings to show that there is a genuine issue for trial. *Id. See also Washington v. Armstrong World Industries, Inc.*, 839 F.2d 1121, 1122–23 (5th Cir.1988).

In the instant case, the parties agree there are no genuine issues as to any material fact with respect to the order of liability among the insurance policies and self-insuring

---

**6.** This policy insures Rosewood and lists Lubripac as an additional insured.

**7.** The defendants argue that the Mutual Release Agreement applies to any claims for reapportionment of the funds paid toward the Saturn settlement, rather than to claims to the salvage value funds. However, the defendants claim Westchester is not entitled to any salvage value funds because the funds were properly paid to the

highest levels of insurers under the defendants' construction of the layers of insurance coverage. *See Vesta Ins. Co. v. Amoco Prod. Co.*, 986 F.2d 981, 988 (5th Cir.1993) *cert. denied,* —— U.S. ——, 114 S.Ct. 80, 126 L.Ed.2d 48 (1993) (holding that money recouped by insurers after paying claims is first applied to the highest layer of coverage).

agreements. Additionally, the defendants have demonstrated that there is an absence of a genuine issue as to any material fact concerning the effect of the Mutual Release Agreement. The defendants offer summary judgment evidence of the Mutual Release Agreement executed by and among TRMI, Lubripac, and Rosewood. The plaintiff argues the effects of the Mutual Release Agreement raise fact issues because the existing circumstances, exhibits, documents and affidavits show an intent to fund part of the Saturn settlement without prejudicing its equitable rights against the parties. The plaintiff, however, has not suggested the release is ambiguous. Under Texas law, interpretation of an unambiguous contract is a question of law for the court. *REO Indus., Inc. v. Natural Gas Pipeline Co.*, 932 F.2d 447, 453 (5th Cir.1991); *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex.1983). Thus, the effect of the terms of the agreement is a question of law, and the defendants have met their burden of showing summary judgment is proper.

A. *The Effect of the Mutual Release Agreement*

■■■ As a preliminary matter, the Court determines that the Mutual Release Agreement does not cut off the plaintiff's claim for reapportionment of the Saturn settlement. Westchester seeks reimbursement based on a theory of equitable subrogation. Upon payment of a loss covered by indemnity insurance, the insurer is subrogated to any rights the insured may have against persons allegedly responsible for causing the loss. *International Ins. Co. v. Medical–Professional Bldg. of Corpus Christi*, 405 S.W.2d 867, 869 (Tex.Civ.App.—Corpus Christi 1966, writ ref'd n.r.e.). *See also American Centennial Ins. Co. v. Canal Ins. Co.*, 843 S.W.2d 480, 482 (Tex.1992) (citing *International* with favor). The insurer's right of subrogation is derived from and limited by the rights of the insured. *Id.* When an insured acts to cut off the insurer's claim, such as by releasing a joint tortfeasor, the insurer's right of subrogation is destroyed. *Id.* However, the insured cannot, after the loss has occurred and

after payment to the insured by the insurer, prejudice the right to subrogation by settling with or releasing the offending party who had knowledge[8] of the insurer's right of subrogation. *Id.* at 870. Although the insurers participated in the settlement negotiations, the insurers did not execute the Mutual Release Agreement. Thus, the Mutual Release Agreement executed solely by the insureds did not destroy International's subrogation rights.

B. *The Pattern of Insurance is Determined On the Date of the Occurrence Giving Rise to Coverage Under the Policy*

■■■ Where there is apparent conflict between clauses of applicable insurance policies, courts should resolve disputes among the carriers by looking to the overall pattern of insurance coverage. *Carrabba v. Employers Cas. Co.*, 742 S.W.2d 709, 714 (Tex.App.—Houston [14th Dist.] 1987, no writ). Westchester argues the overall pattern of insurance should be determined as of the date the policies were written, rather than on the date of the incident giving rise to coverage under the policies—the date of the Saturn incident. Under this construction, any gap in coverage existing when Heddington's policies were issued could not be filled by insurance subsequently provided by International. The defendants, on the other hand, argue the insuring pattern should be determined on the date of the Saturn incident because policy intent and circumstances have meaning only in relation to a particular loss.

The Court finds that the insuring pattern should be determined on the date of the occurrence giving rise to coverage under the policies. If the Saturn incident had occurred prior to the issuance of International's policy, then Lubripac, Texaco and TRMI would have been uninsured for losses between $1,000,000 and $10,000,000. However, the Saturn incident occurred after International issued its policy. International bargained for risks between $1,000,000 and $10,000,000, yet West-

---

**8.** Accepting as true Westchester's pleadings that during the settlement negotiations a dispute arose among the insurers concerning the alloca-

tion of liability under the policies, the defendants had knowledge of Westchester's claims.

chester seeks to avoid liability under the policy.

Westchester should not be permitted to avoid liability under the policy based on an insuring scheme existing before International's policy became effective. When the pattern of insurance is determined on the date of the incident giving rise to coverage under the policies, any insurance which might have been purchased by an insured party to fill gaps in the party's insuring scheme can be given effect. As a result, the insured parties are given the benefit of the bargains under their contracts.

### C. The Order of Liability Among the Policies

■ The Court next must determine the order of liability among the insurance policies and self-insuring agreements. In making this determination, the Court determines the order of liability based on the insuring scheme existing on the date of the Saturn incident, as discussed in Section B of this order.

Westchester moves for summary judgment against Heddington, arguing alternatively that: (1) International's umbrella policy is excess to all other policies, including the Heddington policies with underlying limits of $10,000,000; (2) Heddington's products liability policy was intended to be primary coverage which applies before International's umbrella policy; and (3) if the Heddington policies were excess coverage, they "dropped down" in the event Texaco did not provide underlying insurance to the policies.[9] Westchester also seeks summary judgment against Texaco and TRMI, claiming their failure to provide underlying insurance to the Heddington policies leaves their self-insured layer of coverage liable before International's umbrella coverage.

■ As this is a diversity case, Texas law governs substantive matters of insurance contract interpretation. Insurance contracts are governed by the rules of contract interpretation. *Western Reserve Life Ins. Co. v.*

*Meadows,* 261 S.W.2d 554, 564 (Tex.1953), *cert. denied,* 347 U.S. 928, 74 S.Ct. 531, 98 L.Ed. 1081 (1954). Policies should not be interpreted piecemeal, but all provisions should be given effect, and the entire contract considered, with each clause aiding the interpretation. *Decorative Ctr. v. Employers Casualty,* 833 S.W.2d 257, 260 (Tex.App.— Corpus Christi 1992, writ denied). Furthermore, when "policy terms are not ambiguous, they are 'given their plain, ordinary and generally accepted meaning unless the instrument itself shows that the terms have been used in a technical or different sense.'" *Federal Ins. Co. v. Srivastava,* 2 F.3d 98, 101 (5th Cir.1993) (interpreting Texas law and quoting *Ramsay v. Maryland Am. Gen. Ins. Co.,* 533 S.W.2d 344, 346 (Tex.1976)). If the written instrument is susceptible to only one reasonable construction, it will be given force; otherwise, if subject to more than one reasonable interpretation, then the court must resort to rules of construction. *National Union Fire Ins. Co. of Pittsburgh, Pa. v. Hudson Energy Co.,* 811 S.W.2d 552, 555 (Tex.1991).

### 1. Umbrella Coverage is Not Excess of All Other Insurance

■ Westchester argues that International's $10,000,000 umbrella policy is excess coverage over and above all other policies, including Heddington's excess policies with $10,000,000 underlying limits. Westchester asserts that umbrella policies, unlike other excess policies, are excess over all applicable insurance, whether excess, contingent, contributing or primary coverage, citing *Carrabba v. Employers Cas. Co.,* 742 S.W.2d 709, 714 (Tex.App.—Houston [14th Dist.] 1987, no writ) as authority. The *Carrabba* case held that "where an umbrella policy provides coverage for a loss in excess of the underlying policies listed in its schedule and in excess of the applicable limits of any other *underlying* insurance *collectible by the insured,* all such other *collectible insurance must be exhausted* before liability attaches under the umbrella policy." *Carrabba,* 742 S.W.2d at 715 (*emphasis added*). However, the *Carrabba* case

---

9. Westchester argues that the Heddington policies require Texaco and TRMI to provide $10,-000,000 underlying insurance; whereas, Texaco

and TRMI argue that the terms of the policy merely show that the policy does not apply to losses below $10,000,000.

did not consider whether an umbrella policy is excess of policies with underlying limits above the upper limits of the umbrella policy.[10]

 Westchester's argument cannot succeed because it violates the plain language of both policies, as well as the overall insuring scheme between all parties. Westchester's interpretation would shift International's bargained-for layer of risk to Heddington, leaving Lubripac uninsured for losses between $1,000,000 and $10,000,000. The International policy is a true umbrella policy which, under *Carrabba*, applies in excess of all other primary and excess policies *underlying* International's limits. *Carrabba*, 742 S.W.2d at 715. The Heddington policy, however, does not underlie International's limits. It is a pure excess policy which does not apply until its insured suffers a minimum $10,000,000 threshold loss. Barring a duty to drop down, excess policy coverage is invoked only "when a loss exceeds the policy limits of all underlying policies." *Srivastava*, 2 F.3d at 102. In addition, International's own policy states:

> If the applicable limits of insurance of the "underlying Insurance" or of other insurance are reduced or exhausted by payments from one or more "Occurrences" happening during the "Policy Period" of this policy, the "Limits of Insurance" of this policy will apply in excess of such reduced or exhausted limits.

(*emphasis added*). These terms clearly show that International's policy will be excess to all insurance with applicable limits. Heddington's limits, however, are not applicable below $10,000,000. In short, Westchester's argument belies the plain language of both policies.

 Westchester's construction also violates the overall pattern of insurance intended for the benefit of the insured, leaving Lubripac uninsured as to bargained-for insurance. Under the policies listed above, the Lubripac loss was insured by: (1) Travellers for losses up to $1,000,000; (2) International's umbrella for losses between $1,000,000 and $11,000,000; (3) Heddington through TRMI and Texaco for losses between $10,000,000 and $30,000,000, and by J.H. Blades through Rosewood for losses between $11,000,000 and $61,000,000. Westchester argues the $10,000,000 umbrella policy should apply after the Heddington policies. This interpretation would not only shift International's risk to Heddington, but it would leave Lubripac uninsured for losses between $1,000,000 and $10,000,000 because Heddington's policies are not applicable below $10,000,000. Insurance policies are strictly construed in favor of the insured to avoid the exclusion of coverage. *Ramsay v. Maryland Am. Gen. Ins. Co.*, 533 S.W.2d 344 (Tex. 1976). International bargained for risks between $1,000,000 and $10,000,000; thus, the Court rejects Westchester's interpretation which would leave Lubripac uninsured for that layer of risk.[11]

---

**10.** Excess carriers contract to provide inexpensive insurance with high limits by requiring the insured to contract for primary insurance with other carriers. *Federal Ins. Co. v. Srivastava*, 2 F.3d 98, 101 (5th Cir.1993). Primary, excess and umbrella policies often attempt to make their policies excess coverage to other valid and collectible insurance by using "other insurance" clauses. ROBERT E. KEETON & ALAN L. WIDISS, INSURANCE LAW § 3.11(a)(1) (pract ed. 1988). Litigation often arises over the order of liability among policies with conflicting other insurance clauses.

Under Texas law, a primary policy with an "other insurance" clause must be exhausted before an excess policy applies. *Liberty Mut. Ins. Co. v. U.S. Fire Ins. Co.*, 590 S.W.2d 783, 785 (Tex.Civ.App.—Houston [14th Dist.] 1979, writ ref'd n.r.e.). Similarly, when two applicable excess policies have mutually repugnant other insurance clauses, the clauses will be ignored and

the loss will be prorated between the two insurers. *Hardware Dealers Mut. Fire Ins. Co. v. Farmers Ins. Exch.*, 444 S.W.2d 583, 590 (Tex. 1969). When an umbrella policy insures losses in excess of any other *underlying insurance collectible by the insured*, including excess coverage, then all other *collectible insurance* must be exhausted before liability attaches to the umbrella policy. *Carrabba*, 742 S.W.2d at 715 (*emphasis added*). However, *Carrabba* does not apply to Heddington's policy because the policy is neither underlying International's policy nor collectible below $10,000,000.

**11.** In determining the priority of insurance policies, courts should consider contracted-for risks. *See Srivastava*, 2 F.3d at 102 (noting that, in determining the priority of insurance policies, the court should take care not to shift contracted-for risks); *Harville v. Twin City Fire Ins. Co.*, 885 F.2d 276, 278 (5th Cir.1989) (interpreting Texas

### 2. *Heddington's Products Liability Coverage is Excess, Rather Than Primary*

■ Westchester argues the Heddington products liability endorsement shows an intent to provide $20,000,000 primary coverage for products liability claims because endorsements control over general policy language; yet, the plain language of the Heddington policy belies this position. Endorsements control over *conflicting* general policy language. *Mutual Life Ins. Co. v. Daddy$ Money, Inc.*, 646 S.W.2d 255, 259 (Tex. App.—Dallas 1982, writ ref'd n.r.e.) (*emphasis added*). Westchester suggests conflict arises from two sources in the Heddington contracts: (1) the special conditions; and (2) the notice clauses.

The special conditions and notice clauses show no conflict sufficient to indicate Heddington intended to provide primary, rather than excess products liability coverage. Westchester first points to the Special Conditions Applicable to Section I, arguing that no language in the products liability endorsement indicates the endorsement was to be excess products liability coverage. However, Item 3 of the Declarations to Heddington's L–189 products liability endorsement clearly states Section I coverage relates to Excess Third Party Liability. The terms clearly show intent to provide excess, rather than primary, insurance.

■ Westchester also claims Heddington's notice provision—requiring Texaco to give Heddington notice of claims over $1,000,000, rather than over $10,000,000— shows intent to provide primary products

liability coverage. This argument fails for two reasons. First, policies should be read as a whole, rather than piecemeal. *Decorative Ctr. v. Employers Casualty*, 833 S.W.2d 257, 260 (Tex.App.—Corpus Christi 1992, writ denied). The Heddington policy, read as a whole, shows clear intent to provide only excess coverage beginning at $10,000,000. Second, because the Heddington policy will provide any underlying insurance which might be required by law, and because Texaco and TRMI have a $1,000,000 primary policy with Cigna, Heddington must be advised of any occurrences which might yield losses beginning at $1,000,000 in the event applicable law required Heddington to provide coverage above the Cigna primary policy.

■ Heddington's policy Addendum No. 1, entitled "Non–Pyramiding Limits/Other Insurance" provides:

> In the event underlying insurance to this Policy should be required in order to comply with the laws or regulations of any country in which this policy is applicable, the Underwriters will determine the extent and availability of such other insurance and pay all sums which the Assured shall become legally obligated to pay as damages arising out of an occurrence which is not insured under such underlying policy but for which coverage is afforded under this Policy.

The Addendum further provides that "[i]t is further agreed that the Limits of Liability under this Policy shall be taken in conjunction with specific insurance in force for Texaco Group Companies." Heddington's notice

law and holding that requiring excess carriers to defend in place of insolvent primary carriers would impermissibly shift the primary carrier's risk to the excess carrier). Excess carriers contract to provide inexpensive insurance with high limits *by requiring the insured to contract for primary insurance with other carriers*. *Srivastava*, 2 F.3d at 10. Heddington did not bargain for risks below $10,000,000. International, on the other hand, bargained for risks between $1,000,000 and $10,000,000. Westchester's construction would consciously shift the bargained-for risks between the insurers.

Analogous case law reflects Texas' respect for the bargained-for risks between insurers. Texas does not require an excess insurer to "drop down" and provide coverage when an underlying insurer is insolvent. *Emscor, Inc. v. Alliance Ins.*

*Group*, 804 S.W.2d 195, 198–99 (Tex.App.— Houston [14th Dist] 1991, no writ). *See also Harville*, 885 F.2d at 278–79 (holding that a rule requiring an excess carrier to drop down upon the insolvency of the primary carrier would impermissibly shift the risk of the primary carrier to the excess carrier, and would require insurance companies to scrutinize one another's financial stability before issuing secondary policies). Considering that Texas does not require the excess carrier to cover losses when the primary carrier is insolvent, it is unlikely Texas would adopt a rule requiring excess carriers to drop down in place of a collectible umbrella policy with limits below the excess policy's limits because the rule would consciously shift the risks between the insurers.

provision, therefore, does not show an intention to drop down and provide coverage at $1,000,000, but shows an intent to provide coverage beginning at $10,000,000 unless applicable law requires the insurer to provide underlying insurance. The plain language of Heddington's policy shows no conflict and nothing more than an intent to provide $20,000,000 excess products liability coverage. Courts will not create an ambiguity in an insurance policy where none exists, nor will they make a new contract for the parties. *National Union Fire Ins. Co. v. Kasler Corp.*, 906 F.2d 196, 198 (5th Cir.1990) (interpreting Texas law and citing *Yancey v. Floyd West & Co.*, 755 S.W.2d 914, 918 (Tex.App.—Ft. Worth 1988, writ denied)).

### 3. *Heddington's Policies Do Not Drop Down*

Westchester argues that the terms of the policies require Heddington to drop down in the event Texaco and TRMI fail to provide $10,000,000 underlying insurance.[12] Westchester claims Condition 5 of the Heddington policies mandated Texaco and TRMI to purchase $10,000,000 underlying insurance.[13] Westchester further argues that Heddington's Addendum No. 1 requires the Heddington policies to drop down and provide coverage if Texaco and TRMI fail to provide the underlying insurance. Under the plain language of the Heddington policies, Westchester's interpretation fails.

Condition 5 does not require TRMI and Texaco to provide underlying insurance, and the addendum does not require Heddington to drop down. Condition 5 is entitled Maintenance of Underlying Insurances, and states:

It is a condition that the Policy or Policies referred to in the attached "Schedule of Underlying Insurance" shall be maintained in full effect during the policy period without reduction of coverage limits.

Failure to comply with the foregoing shall not invalidate this insurance but in the event of such failure, the Insurers shall only be liable to the same extent as they would have been in the absence of such failure.

Texaco and TRMI were not required to provide underlying insurance because Heddington's policies would apply even if Texaco and TRMI failed to provide the underlying insurance.[14] In addition, Addendum No. 1 does not require Heddington to drop down,[15] as Westchester suggests. Consequently, Heddington's policies do not drop down and provide primary coverage.

### 4. *Texaco and TRMI's Self–Insurance Was Not Valid and Collectible Insurance*

■ Westchester claims Texaco and TRMI's self-insurance should be liable either prior to or concurrently with International's umbrella coverage. The defendants' self-insurance, however, was not valid and collectible insurance. Therefore, Texaco and TRMI's self-insured layer is not liable for losses between $1,000,000 and $10,000,000.

Westchester contends Texaco and TRMI's self-insurance is valid and collectible insurance to Lubripac, citing *Hartford Cas. Ins. v. Budget Rent–A–Car*, 796 S.W.2d 763 (Tex. App.—Dallas 1990, writ denied) and *Provost v. Unger*, 949 F.2d 161 (5th Cir.1991) (interpreting Louisiana law) as authority. Under the *Hartford* and *Provost* rationale, however, Texaco or TRMI's self-insurance would be valid and collectible insurance to Lubripac only if Texaco or TRMI had contractually agreed to provide Lubripac with insurance.

---

12. Westchester also claims the Heddington policies must drop down because TRMI was contractually obligated to provide underlying insurance.

13. Westchester also argues the Section III Aircraft Liability endorsement's Maintenance of Primary Insurance conditions, which clearly mandates underlying insurance under penalty of forfeiture of the Section III coverage if the underlying insurance is not purchased, show that the Heddington policy requires Texaco and TRMI to provide underlying insurance. This argument is without merit. Condition 5 under Section I and

II Excess Third Party Liabilities shows no penalty for failure to maintain underlying insurance. Whereas, the Section III Aircraft Liability endorsement states that coverage is forfeited if underlying insurance is not maintained. The differences between the conditions merely supports the finding that Condition 5 does not mandate Texaco or TRMI to provide underlying insurance.

14. *See supra* note 12.

15. *See supra* Section B(2).

*Hartford* 796 S.W.2d at 797–99; *Provost* 949 F.2d at 163–64. Absent an agreement to provide insurance to Lubripac, Texaco and TRMI's self-insurance is not valid and collectible.

Westchester suggests TRMI contractually agreed to provide Lubripac with insurance in a Purchase and Sales Agreement. However, TRMI did not agree to provide Lubripac with insurance above $1,000,000. The Purchase and Sales Agreement between Lubripac and TRMI requires TRMI to provide Lubripac with comprehensive general liability coverage of not less than $1,000,000 and automobile liability coverage for owned, hired and non-owned automobiles with limits of not less than $1,000,000. TRMI provided the required $1,000,000 policy with Cigna. Nothing in the agreement requires TRMI to provide insurance above $1,000,000. In fact, the agreement states "Lubripac shall maintain at Lubripac sole expense a products liability insurance policy with a limit of not less than $10,000,000 total coverage." Therefore, under *Hartford* and *Provost,* Texaco and TRMI's self-insurance is not valid and collectible insurance subject to the overall pattern of insurance because neither party contracted to provide Lubripac with that layer of insurance.

▉▉▉▉▉ Therefore, considering that each of Westchester's arguments for lifting the International umbrella policy above the Heddington policy and the Texaco/TRMI self-insurance have failed, the Court determines that the proper order of liability among the insurance policies at issue are: (1) Travellers primary policy for losses up to $1,000,000; (2) International's umbrella policy for losses between $1,000,000 and $11,000,000; (3) Heddington through TRMI and Texaco for losses between $10,000,000 and $30,000,000; and (4) J.H. Blades through Rosewood for losses between $11,000,000 and $61,000,000. Consequently the $10,000,000 International paid toward settlement of the Saturn claim was properly paid, and Westchester is not entitled to reimbursement for those funds. Finally, Westchester is not entitled to reimbursement from Heddington for the salvage value realized on disposition of the damaged automobiles because, as a matter of law, entitlement to the salvage value depends on the priority of the insurance policies. Money recouped by insurers after paying a claim is first applied to the highest layer of coverage, or " 'off the top' " of the ultimate net loss. *Vesta Ins. Co. v. Amoco Prod. Co.,* 986 F.2d 981, 988 (5th Cir.1993) *cert. denied,* —— U.S. ——, 114 S.Ct. 80, 126 L.Ed.2d 48 (1993) (interpreting Texas law). International was not entitled to salvage value funds because the proceeds did not exceed the payments Heddington and J.H. Blades made in settling the Saturn claim. Consequently, Westchester is not entitled to reimbursement from Heddington.

Westchester's claims against Heddington, Texaco and TRMI depended upon either a finding that Heddington's policies applied prior to International's umbrella policy or a finding that Texaco or TRMI were obligated to provide $10,000,000 underlying insurance for the Heddington policies. Because the Court finds that International's umbrella policy applied before the Heddington policies and that Texaco and TRMI were not obligated to provide underlying insurance, Westchester's claims fail. Therefore, Heddington, Texaco and TRMI are entitled to summary judgment on plaintiffs claims for reimbursement of the $10,000,000 International paid in settling the Saturn claim and for reimbursement of salvage values recovered from disposition of the damaged automobiles.

Based on the foregoing, the Court

ORDERS that Heddington's, Texaco's and TRMI's motions for partial summary judgment are GRANTED, Heddington's motion for summary judgment is DENIED as MOOT, and Westchester's motion for partial summary judgment is DENIED.