# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

February 1, 2008

Charles R. Fulbruge III
Clerk

No. 07-20313
Summary Calendar

SERVICE CORPORATION INTERNATIONAL

Plaintiff-Appellant

v.

GREAT AMERICAN INSURANCE COMPANY OF NEW YORK

Defendant-Appellee

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:06-CV-2484

Before JOLLY, DENNIS, and PRADO, Circuit Judges.

PER CURIAM:[*]

Service Corporation International ("SCI") sued Great American Insurance Company of New York ("Great American"), (1) alleging that Great American breached an insurance policy it issued to SCI when it failed to provide coverage for certain claims, and (2) seeking a declaration that the policy requires Great American to cover those claims.  The district court granted summary judgment in favor of Great American, finding that Great American's excess liability policy

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

coverage has not been triggered because SCI's underlying primary insurance policy has not been exhausted. For the following reasons, we AFFIRM the judgment of the district court.

## I. FACTUAL AND PROCEDURAL BACKGROUND

SCI is a funeral services company with cemeteries throughout the United States. Several individual and class action plaintiffs sued SCI for grave desecrations and improper burials at two of SCI's cemeteries, Menorah Gardens Fort Lauderdale and Menorah Gardens West Palm Beach (the "Menorah Gardens lawsuits"). Some, but not all, of the events underlying the Menorah Gardens lawsuits occurred between May 1, 2000, and May 1, 2001 (the "2000-2001 policy year"). During the 2000-2001 policy year, SCI was covered by a $25 million insurance policy from Texas Pacific Indemnity Company ("Chubb") and a $50 million excess liability policy (to be triggered only when the Chubb policy was exhausted) from Great American.[1]

While the Menorah Gardens lawsuits were pending against SCI, Chubb apparently determined that its covered claims relating to that litigation would likely exceed its $25 million policy limit for the 2000-2001 policy year, and Chubb tendered the full $25 million to SCI "in an attempt to accomplish a global settlement of all claims concerning the desecrations and spacing problems at . . . Menorah Gardens." In exchange, SCI agreed that if SCI did not settle claims against it related to the Menorah Gardens lawsuits, SCI would "indemnify and hold harmless [Chubb] for its contractual obligations under its policies . . . ." SCI subsequently entered into a global settlement of all claims brought by the plaintiffs represented by the Gonzalez and Hirschfeld law firms for $100 million. This settlement covered both claims arising during the 2000-2001 policy year and claims arising outside of it. The Gonzalez and Hirschfeld

---

[1] SCI also had coverage under another $1 million policy that is not relevant to this appeal.

firms ultimately allocated only $13.75 million of the $100 million to claims arising during the 2000-2001 policy year.

In addition to its losses related to the Menorah Gardens lawsuits, SCI has incurred more than $2 million in other insured losses during the 2000-2001 policy year (the "non-Menorah Gardens claims"). SCI requested coverage from Great American for the non-Menorah Gardens claims. Great American denied coverage, asserting that its excess liability coverage had not been triggered because only $13.75 million had actually been paid to plaintiffs with claims arising during the 2000-2001 policy year, an amount not reaching the $25 million underlying policy limit. On July 27, 2006, SCI filed an action against Great American, alleging that Great American's refusal to pay the non-Menorah Gardens claims constituted a breach of its policy agreement and seeking a declaration that Great American must pay SCI for its losses related to the non-Menorah Gardens claims. The district court granted summary judgment in favor of Great American, finding that Chubb's $25 million payment had not exhausted its policy limits because it was not made in payment of claims, as required to trigger Great American's coverage. SCI appeals, and we have jurisdiction over the appeal under 28 U.S.C. § 1291.

## II. DISCUSSION

We review de novo the district court's grant of a motion for summary judgment. Tex. Indus., Inc. v. Factory Mut. Ins. Co., 486 F.3d 844, 846 (5th Cir. 2007). Summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c).

The parties agree that Texas law applies to this case. Under Texas law, we interpret insurance policies using the general rules that govern the interpretation of other contracts. Schneider Nat'l Transp. v. Ford Motor Co., 280 F.3d 532, 537 (5th Cir. 2002). Our primary goal "'is to ascertain and to give

effect to the intent of the parties as expressed in the instrument.'"  Id. (quoting R&P Enters. v. LaGuarta, Gavrel & Kirk, Inc., 596 S.W.2d 517, 518 (Tex. 1980)). We accomplish this by considering the policy as a whole and interpreting the policy terms according to their plain and ordinary meaning.  Id.  In addition, we construe insurance policies and their endorsements together unless they are so much in conflict they cannot be reconciled.  See Mesa Operating Co. v. Cal. Union Ins. Co., 986 S.W.2d 749, 754 (Tex. App. 1999).

At issue in this appeal is whether, as a matter of law, Chubb's tender of $25 million to SCI triggered Great American's excess liability coverage for the 2000-2001 policy year.  We begin with an examination of the Great American policy and endorsements.  The "Other Insurance" clause of the Great American policy states, "The insurance afforded by this policy shall be excess insurance over any valid and collectible insurance available to [SCI], for loss covered by [the Chubb policy] . . . ." (emphasis added).[2]  The Great American policy incorporates the Chubb policy's definition of "loss," which is "those sums actually paid in the settlement or satisfaction of a claim which the insured is legally obligated to pay as damages because of injuries or offense . . . ." (emphasis added).  Similarly, the Great American policy's "Following Form Endorsement" states, "Nothing contained in this endorsement will obligate the company to pay a claim . . . before the underlying insurance . . . is exhausted by payment of a claim or claims" (emphasis added).  Moreover, the "Aggregate Limits Endorsement" provides,

> In the event of . . . exhaustion of the aggregate limit or limits designated in the underlying policy or policies solely by payment of

---

[2] SCI claims that the "Other Insurance" clause does not apply to this dispute and that we should examine only the language in the endorsements.  However, even assuming, arguendo, that SCI is correct, our analysis would be unchanged, because the endorsements contain the same key language as does the "Other Insurance" clause, which leads to the same conclusions.

> losses in respect to claims, accidents, or occurrences during the period of such underlying policy or policies, it is hereby understood and agreed that such insurance as is afforded by this policy shall apply as underlying insurance, notwithstanding anything to the contrary in the terms and conditions of this policy.

(emphasis added).

These clauses show that Great American agreed to provide excess insurance over the amount SCI is entitled to collect from Chubb for losses—sums actually paid in settlement of claims. The clauses consistently demonstrate that the parties intended loss and exhaustion to be measured by the sums used for payment of claims, not simply by the sums paid. The fundamental issue, then, is whether Chubb's payment of $25 million was paid in settlement or satisfaction of claims for the 2000-2001 policy year, thereby exhausting Chubb's coverage and triggering Great American's coverage. Cf. Fed. Ins. Co. v. Srivastava, 2 F.3d 98, 102-03 (5th Cir. 1993) (noting that an excess insurer's coverage "begins when a loss exceeds the policy limits of all underlying policies . . . regardless of whether the underlying insurers actually pay those limits" and holding that an excess insurer had no liability when losses did not reach its coverage layer even though underlying insurers were insolvent and could not pay).

According to SCI, Chubb's $25 million payment of its policy limits for the 2000-2001 policy year must have been a payment in settlement of claims, because the only possible liability Chubb could have had to SCI under Chubb's policy was for claims. SCI may be correct that Chubb reasonably believed that SCI was likely to incur more than $25 million in losses due to the payment of claims and that Chubb's belief caused it to tender payment to SCI. However, we are unpersuaded that Chubb's subjective estimate of SCI's probable losses for 2000-2001 should determine the actual amount of loss SCI suffered, particularly for purposes of a contract between SCI and Great American. As explained above, the terms of the policy show that Great American and SCI agreed that

5

losses would be measured by payment of claims. Great American contemplated the risk that SCI would be subject to claims in excess of Chubb's policy limits. It did not contemplate that Chubb would pay its policy limits without regard to whether the payment would be used for covered claims. We must be "careful not to shift contracted-for risks." Srivastava, 2 F.3d at 102.

SCI also argues that because it paid the full $25 million from Chubb to various claimants as part of a lump-sum settlement rather than pocketing the $11.25 million that was not eventually paid for 2000-2001 claims, the full $25 million constituted a loss. However, to be counted toward the $25 million loss threshold needed to trigger Great American's excess policy coverage, the loss must be attributable to the 2000-2001 policy year. The $100 million settlement represented a lump sum paid for claims arising both during and outside the 2000-2001 policy year, and only $13.75 million went to claims arising during the 2000-2001 policy year. Thus, of the $25 million Chubb paid, only $13.75 million constituted a loss for 2000-2001 under the terms of the Great American policy. The remaining $11.25 million was used to cover other claims and cannot be considered in determining whether the loss threshold that would trigger Great American's coverage has been reached.

SCI also contends that because Chubb tendered its full policy limits based on a good-faith belief that it had liability on claims that would exceed $25 million, a court cannot reconsider that decision in light of subsequently discovered facts. In support of this position, SCI cites Keck, Mahin & Cate v. National Union Fire Insurance Co., 20 S.W.3d 692, 702-03 (Tex. 2000), and National Surety Corp. v. Western Fire & Indemnity Co., 318 F.2d 379, 385-86 (5th Cir. 1963). In Keck, an excess insurer who paid part of a claim sued the primary insurer and the primary insurer's attorneys for equitable subrogation, alleging that the attorneys' negligent handling of the underlying lawsuit had forced the excess insurer to pay too much. 20 S.W.3d at 695-96. As a defense,

the attorneys argued that because a thorough investigation of the claim would have shown that the excess insurer actually had no liability, the excess insurer was a "volunteer" with respect to its settlement payment and was not entitled to subrogation. Id. at 702. The Texas Supreme Court disagreed, holding that "[a]n insurer who pays a third-party claim against its insured is not a volunteer if the payment is made in good faith and under a reasonable belief that the payment is necessary to its protection." Id. It reasoned that adopting the attorneys' position "would significantly increase potential conflicts of interest between insureds and their insurers" and "discourage insurance companies from paying or settling disputed claims and thereby force insureds more often into litigation with their insurers." Id. at 703 (internal quotation marks omitted). Similarly, in National Surety Corp., the court held that one insurer could not defeat its obligation to reimburse a co-insurer for the co-insurer's good-faith settlement by arguing that the co-insurer did not actually have liability for the settled claims. 318 F.2d at 385-86.

Despite SCI's assertion to the contrary, neither Keck nor National Surety Corp. controls the outcome in this case. In both of those cases, a third party was challenging an insurer's coverage decision based on subsequently acquired information in a way that could compromise the settling insurer's rights. As the court in Keck explained, allowing such second-guessing would encourage insurance companies to litigate disputed claims and discourage insurance companies from settling. 20 S.W.3d at 703. Here, however, that rationale does not apply, because Chubb's rights are not at stake. No one is questioning Chubb's business decision to settle with SCI for $25 million or arguing that Chubb should be held responsible for an unwise settlement decision. Rather, the issue is simply whether Chubb's payment triggers Great American's policy coverage. SCI does not explain, and we do not see, how a holding in favor of Great American in this case would discourage insurance companies in positions

similar to Chubb's from entering settlement agreements with their policyholders. Therefore, the public policy considerations that motivated the court in Keck and that were present in National Surety Corp. are not present here.

Finally, SCI argues that even if Chubb's payment did not exhaust its policy limits as a matter of law, there is a fact issue regarding exhaustion that precludes summary judgment. It cites Dresser Industries, Inc. v. Underwriters at Lloyd's, London, 106 S.W.3d 767, 776 (Tex. App. 2003), for this proposition. In Dresser, an insured party entered a settlement, the primary insurers tendered their policy limits, and the excess insurer contributed to the settlement. Id. at 768-69. The insured party then sought coverage from the excess insurer for unrelated claims, and the excess insurer argued that the underlying policies had not been exhausted because the settled claims were fraud claims that should never have been covered. Id. at 769. The trial court granted summary judgment to the excess insurer, holding that the underlying claims were not covered losses because they were non-covered fraud claims, and thus exhaustion was impossible. Id. at 774-75. The appeals court reversed, finding that the fact that the underlying insurers settled for the full amount of their coverages and that the excess carrier contributed as well created fact issues concerning exhaustion and coverage. Id. at 776. SCI contends that Dresser establishes a rule that the tender of policy limits, alone, is sufficient to raise a fact issue concerning exhaustion. We disagree. In Dresser, it appears, the fact that multiple insurers paid out their policy limits created a fact issue as to exhaustion because it created a fact issue about coverage—whether the coverage question was as simple as applying a fraud exclusion that any insurance company would have immediately recognized. Here, however, there is no analogous dispute over whether claims were covered. The dispositive fact in this case is undisputed: only $13.75 million was ultimately paid to plaintiffs with covered claims arising

within the 2000-2001 policy year. Based on that fact, we conclude that Chubb's policy has not been exhausted in a way that triggers Great American's coverage. SCI identifies no genuine disputed issues of fact that could change that conclusion.

In sum, the plain language of the Great American insurance policy and its endorsements demonstrates that Great American's coverage is not triggered until SCI's losses—defined as sums actually paid in settlement of claims—have reached $25 million. Because only $13.75 million has been paid in settlement of relevant claims thus far, Great American's coverage layer has not been reached. SCI's position to the contrary is at odds with the terms of the Great American policy and is not supported by Texas case law. Therefore, Great American need not provide coverage for the non-Menorah Gardens claims.

## III. CONCLUSION

The district court correctly concluded that, as a matter of law, Great American's policy layer has not yet been reached. Therefore, Great American did not breach its contract with SCI, and SCI is not entitled to declaratory relief. Thus, we AFFIRM the judgment of the district court granting summary judgment in favor of Great American.

AFFIRMED.