# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 09-1569

_____

| | | |
|---|---|---|
| Travelers Property Casualty Insurance Company of America, formerly known as Travel Indemnity Company of Illinois, | * * * * * | |
| Plaintiff - Appellant, | * * | |
| v. | * * * | Appeal from the United States District Court for the Western District of Missouri. |
| National Union Insurance Company of Pittsburgh, Pennsylvania; Kansas City Power & Light, | * * * * | |
| Defendants - Appellees, | * * | |
| Reliance National Insurance Company, | * * | |
| Defendant. | * | |

_____

Submitted: November 17, 2009
Filed: September 2, 2010

_____

Before MELLOY, BEAM, and GRUENDER, Circuit Judges.

_____

MELLOY, Circuit Judge.

Travelers Property Casualty Insurance Company of America ("Travelers") appeals the district court's adverse grant of summary judgment on its claims against

Kansas City Power & Light ("KCPL") and National Union Insurance Company of Pittsburgh, Pennsylvania ("National Union") for $10 million in subrogation proceeds. We affirm in part and reverse in part, holding Travelers, as the excess insurer, is entitled to a priority interest in the subrogation proceeds representing insured losses.

I.    Background

KCPL is a public utility company located in Kansas City, Missouri. In February 1999, an explosion occurred at a KCPL generating station, the Hawthorne Generating Station ("Station"). A jury later determined the explosion caused approximately $452 million in total losses. This total loss amount included such items as physical damage to the Station, cleanup and demolition expenses, lost fuel, replacement energy costs, lost profits, and various other expenses. The total loss took into consideration offsets due to decreased operating expenses that normally would have been associated with the Station.

It is undisputed that some of these broad categories of loss were insured and some were not. In fact, the claims KCPL submitted to its insurers totaled only $285 million. Relevant to the present appeal, National Union insured the Station as the primary insurer, providing $200 million in coverage.[1] Travelers served as the excess insurer, providing $100 million in excess coverage. The Travelers policy was a true excess policy providing that coverage did not begin until KCPL's "ultimate net loss," i.e., KCPL's insured loss, exceeded $200 million. Consistent with this fact, KCPL paid roughly $850,000 to National Union as the premium for the primary policy's first $200 million in coverage and roughly $25,000 to Travelers for the $100 million of

_____

[1]A separate company, Reliance National Insurance Company, actually provided $25 million of the first $200 million of primary coverage. Reliance National's participation as an insurer is not relevant to any issues on appeal.

excess coverage. Both policies contained subrogation provisions, and, subject to a limited exception, the Travelers policy adopted the form of the National Union policy.

After the explosion, KCPL invited National Union and Travelers to participate in talks regarding potential litigation against third parties and the allocation of litigation expenses and recoveries. KCPL indicated to the insurers that, because it had suffered uninsured and insured losses, it likely had an independent interest in claims against potentially responsible third-parties separate from the insurers' subrogation interests.

An adjuster scheduled a meeting for November 15, 1999, to discuss these issues and notified Travelers of the meeting. Internal communications at Travelers indicate personnel from Travelers received the notice, were aware of the preliminary meeting, and understood subrogation would be a topic of discussion at the meeting. Prior to this time, an adjuster's report had indicated the total insured loss might exceed the first $200 million of coverage provided by National Union and reach into Travelers's coverage. It was not certain, however, that the total insured loss would exceed $200 million, and National Union had not yet paid its policy limits. Travelers took the position that the total insured loss likely would not reach into the excess coverage. According to the appellees, and according to Travelers's own internal written communications, Travelers elected not to participate in the November 15, 1999 subrogation discussions because Travelers did not want to "send the wrong message" by suggesting a belief that the insured loss—the ultimate net loss—would reach into the excess coverage.

In June 2000, National Union and KCPL entered into an allocation agreement ("Allocation Agreement") regarding subrogation expenses and recoveries. Subject to minor exceptions, National Union and KCPL agreed to apportion subrogation expenses and recoveries between themselves 55% and 45% respectively. The Allocation Agreement contained recitals memorializing KCPL's and National Union's reasons for entering into the agreement. These recitals noted some of the losses were

insured, some were uninsured, and KCPL and National Union viewed cooperation in the prosecution of claims against third parties as being in their mutual best interests.

In a September 19, 2000 meeting, KCPL invited Travelers to enter into the Allocation Agreement. Travelers expressly declined in writing in an October 13, 2000 letter stating Travelers did not believe the insured loss would exceed $200 million and did not anticipate making a payment that would give rise to a subrogation interest. Travelers, however, expressly reserved any subrogation right that it may have held, stating, "While the adjustment to date indicates the loss is not likely to exceed $200 million, Travelers reserves its right to participate in the subrogation agreement if the situation changes." As of that time, KCPL and National Union had not yet filed any actions against potentially responsible third parties, and National Union had not paid KCPL its policy limits.

Litigation then moved forward on two fronts: KCPL and National Union sought recoveries from potentially responsible third parties pursuant to the Allocation Agreement ("Subrogation Litigation"), and KCPL brought suit against National Union and Travelers seeking insurance coverage ("Coverage Litigation").

In the Subrogation Litigation, National Union and KCPL filed suit against several third parties, all but one of which settled prior to trial. This settlement resulted in the recovery of approximately $126 million. KCPL and National Union divided this settlement amount between themselves according to the Allocation Agreement.

KCPL and National Union proceeded to trial in Missouri state court against the sole remaining tortfeasor, Rockwell Automation. In an August 26, 2002 letter, before the trial against Rockwell Automation, an attorney for Travelers notified KCPL's holding company parent that "Travelers intends to take the position that these recoveries will be netted against any payments that Travelers may ultimately be responsible for on this claim." The trial resulted in the jury determination, referenced above, that the total loss from the explosion was $452 million. The jury also found

-4-

KCPL was partially at fault and Rockwell Automation was liable for approximately $97 million. The Missouri trial court reduced that amount to approximately $190,000 based on an interpretation of a contract between KCPL and Rockwell Automation. The Missouri Court of Appeals subsequently reversed the trial court and entered judgment reinstating the jury's $97 million award.

Regarding coverage disputes, KCPL submitted insurance claims to National Union and Travelers for $200 million and $85 million, respectively. KCPL submitted these claims before the Rockwell Automation trial. National Union paid a portion of its policy limits, but contested the balance of the claim. As the excess insurer whose coverage was secondary and supplemental to National Union's unexhausted coverage, Travelers contested KCPL's claim on the excess policy. The insurers disagreed with KCPL's assertions regarding the quantity of loss and the character of certain losses as insured or uninsured.

KCPL then initiated the Coverage Litigation against National Union and Travelers in state court to resolve the disputed coverage issues. In addition, KCPL asserted a claim against National Union for vexatious refusal to pay. The insurers removed the Coverage Litigation to the United States District Court for the Western District of Missouri.

In the Coverage Litigation, Travelers identified National Union's and KCPL's settlements with responsible third parties as evidence that KCPL's insured loss was less than $200 million. Travelers argued that recoveries from third parties effectively reduced KCPL's "ultimate net loss."

The district court issued two rulings in the Coverage Litigation addressing the question of whether recoveries from third parties reduced KCPL's "ultimate net loss." The court framed the core issues as (1) whether KCPL was entitled to declare the nature of recoveries from third parties as representing insured or uninsured losses, and (2) whether the recoveries from third parties represented insured or uninsured losses.

The district court determined that KCPL, which undisputedly suffered a total loss in excess of any insurance coverage, had the authority to determine the nature of recovered proceeds as representing payments for insured or uninsured losses. The district court further determined that KCPL exercised this authority when entering into the Allocation Agreement and that the money KCPL received as its share in the $126 million subrogation settlement represented uninsured rather than insured losses. The court stated:

> The Allocation Agreement entered into by KCPL and National Union contemplates a recovery of both the insured and uninsured losses suffered by the plaintiffs. Because the suit prosecuted by KCPL and National Union was intended to recover both insured and uninsured losses, it is reasonable to surmise that the amount recovered by National Union–the primary insurer–represents the insured loss, while the amount recovered by KCPL is attributable to its uninsured loss. In any event, given the case law on the subject, it is KCPL's prerogative to declare how much of the monies it has recovered from third parties should be allocated to its uninsured loss. It has done so in this case.

> For these reasons, the Court holds that the $56 million recovered by KCPL from third parties [KCPL's fractional interest pursuant to the Allocation Agreement] is attributable to its uninsured loss. This amount, therefore, cannot be used in calculating KCPL's "ultimate net loss" under the excess policy.

Kansas City Power & Light Co. v. National Union and Travelers, No. 02-680-CV-W-DW (W.D. Mo., Sept. 10, 2004 Order). In an earlier, June 15, 2004 order from the same Coverage Litigation, the district court refused to entertain certain arguments that KCPL had made regarding interpretation of the phrase "ultimate net loss." The court viewed KCPL's arguments as advancing only subrogation-based rather than coverage-based arguments and refused to address them. The court stated:

> KCPL advances another line of arguments aimed at destroying Travelers' "ultimate net loss" interpretation. However, the Court need not address

those arguments because they apply when subrogation is the issue. Here, no money has been paid by Travelers to KCPL, nor has any showing yet been made that KCPL is entitled to payment under the excess policy. For these reasons, and for those already articulated in the body of the Order, subrogation simply is not an issue in this motion. Arguments applying the principles of subrogation have no place in the interpretation of the excess policy's "ultimate net loss" clause.

Id. (June 15, 2004 Order). In summary, the district court in the Coverage Litigation, in discussing arguments from Travelers, determined the characterization of subrogation proceeds under the Allocation Agreement in order to resolve questions regarding "ultimate net loss." The court, however, refused to entertain separate subrogation-based arguments by KCPL relevant only to Travelers because Travelers had not yet made payment on the excess policy.

After these rulings, National Union paid its policy limits and KCPL voluntarily dismissed National Union from the Coverage Litigation. Travelers and KCPL then entered into a settlement agreement ("Settlement Agreement") in which Travelers agreed to pay $10 million to settle the insurance claim and the Coverage Litigation.[2] Travelers and KCPL also agreed to the voluntary dismissal of the Coverage Litigation, and the district court subsequently dismissed the Coverage Litigation with prejudice, as per the parties' request. No party contested or appealed the district court's 2004 order determining that KCPL had the authority to, and in fact did, characterize its

---

[2]KCPL argues the $10 million settlement in the coverage litigation was not a payment on the claim. KCPL concludes Travelers has made no payment pursuant to the excess policy and therefore holds no subrogation rights whatsoever. This argument is without merit as it ignores the nature of the underlying claim in the Coverage Litigation. It also ignores language from recitals in the Settlement Agreement ("Inasmuch as it is the desire of KCPL and Travelers to resolve the Insurance claim, Travelers has agreed to pay the sum of TEN MILLION dollars . . . to KCPL in exchange for this full and final release of liability") and language from release provisions of the Settlement Agreement (releasing Travelers from all liability "with respect to the Insurance Claim"). We do not address KCPL's argument further.

portion of all settlement proceeds as uninsured losses. Further, no party disputes the fact that the dismissal with prejudice in the Coverage Litigation was a final judgment.

At the time that KCPL and Travelers entered into the Settlement Agreement, the state trial court had reduced the award against Rockwell Automation to $190,000, but the Missouri Court of Appeals had not yet reinstated the jury's original $97 million award. KCPL took the position that Travelers was not entitled to proceeds from any third-party recoveries. Travelers asserted it was entitled to a priority subrogation interest in such proceeds. Travelers and KCPL, therefore, addressed this issue in the Settlement Agreement.

The parties acknowledged the existence of this dispute and reserved for Travelers any subrogation rights that it might hold as to the then-pending judgment in the state court action against Rockwell Automation. Travelers and KCPL specifically referenced the case involving Rockwell Automation, by name and case number, and specifically agreed to defer their resolution of the subrogation dispute until after a final judgment in the case against Rockwell Automation. Travelers, however, expressly waived any subrogation interest it may have held as to the $126 million of settlement proceeds KCPL and National Union had previously obtained from third parties and divided between themselves. As a result, at the time the Missouri Court of Appeals reinstated the $97 million jury award and entered a final judgment against Rockwell Automation, Travelers maintained whatever right it held to assert a subrogation claim against the $97 million. KCPL did not admit in the Settlement Agreement, however, that Travelers, in fact, held any such right. National Union was not a party to the Settlement Agreement.[3]

_____

[3]In the Settlement Agreement, Travelers reserved the right, specifically, to assert a subrogation interest against "any future recoveries" and waived the right to assert a subrogation interest as to "any amount previously obtained." KCPL now argues the amount ultimately recovered from Rockwell Automation was an amount "previously obtained" because the jury in the subrogation litigation had announced its verdict before Travelers and KCPL entered into the Settlement Agreement. This

-8-

After the Missouri Court of Appeals entered final judgment for the sum of $97 million against Rockwell Automation, Travelers asserted its claimed subrogation interest in an attempt to recoup its $10 million payment. Travelers claimed to possess a priority interest over National Union and KCPL. When payment was not forthcoming, Travelers instituted the present federal litigation.

In the district court, Travelers asserted several different theories to support its claims, and all three parties moved for summary judgment. National Union and KCPL presented substantive arguments and also argued Travelers had waived any contractual subrogation rights it may have held by not participating in the Allocation Agreement or the Subrogation Litigation. The district court rejected the waiver argument but otherwise ruled against Travelers and in favor of National Union and KCPL.

Regarding the claims against KCPL, the district court determined the amount KCPL recovered from third parties represented uninsured losses and further determined KCPL was entitled to retain such amounts. Travelers argued that

---

argument fails for two reasons. First, it fails because final judgment in the subrogation litigation did not occur until later, after the Missouri Court of Appeals issued its decision in the matter. That appellate decision post-dated the Settlement Agreement. Second, it fails because KCPL and Travelers unambiguously referenced the pending case against Rockwell Automation in the Settlement Agreement, by name and by case number:

> KCPL and Travelers may defer any resolution of their dispute concerning subrogation rights to future recoveries until such time as there is a settlement or a final appellate decision involving Civil Action No. 01-CV-207897 against Rockwell Automation, Inc. (f/k/a/ Allen-Bradley Company). . . . KCPL agrees to notify Travelers in the event of a settlement or final appellate decision involving Civil Action No. 01-CV-207987. In the event of a settlement, KCPL further agrees to disclose the amount of the settlement to Travelers.

characterization of the recovery as insured or uninsured did not matter, but the district court rejected this argument. In so holding, the district court acknowledged open questions under Missouri law regarding an insured's ability to characterize and retain funds as representing insured or uninsured losses. The court then concluded that the Missouri Supreme Court would likely permit KCPL to characterize and retain funds as representing uninsured losses. In so holding, the court relied primarily upon dicta in one Missouri case and the holding in a district court case from the District of Columbia. See Keisker v. Farmer, 90 S.W.3d 71 (Mo. 2002) (En banc); Fed. Sav. & Loan Ins. Corp. v. Ins. Co. of N. Am., No. 86-0262, 1989 WL 39031 (D.D.C. Apr. 13, 1989).[4]

Regarding the claims against National Union, the district court held Travelers was not entitled to recover any amount from National Union because "National Union is not a party to the Travelers policy and Travelers is not a party to the primary policy"; "equitable principles do not create a legal duty requiring National Union to reimburse Travelers"; and "standard insurance industry practice does not require National Union to reimburse Travelers."

Travelers appeals, renewing some but not all of its arguments from the district court.[5]

---

[4]These were the same cases the court had cited in its 2004 orders from the Coverage Litigation when it determined that KCPL possessed the right to designate whether recoveries through the Allocation Agreement represented insured or uninsured losses.

[5]In the district court, Travelers argued National Union owed Travelers a duty of good faith and fair dealing. Travelers also argued it was a third party beneficiary of the National Union Insurance policy. The district court rejected these arguments, and the parties agree Travelers has waived these arguments on appeal.

II.    Discussion

We review a grant of summary judgment de novo.  Burkhart v. Am. Railcar Indus., 603 F.3d 472, 473 (8th Cir. 2010).  Missouri law controls as to all substantive matters in this case: the insurance policies, the Allocation Agreement, and the Settlement Agreement are governed by Missouri law.  The parties also raise waiver issues (related to Travelers's refusal to participate in the Allocation Agreement or Subrogation Litigation) and subrogation issues based, in part, on equitable principles.  Although the parties disagree as to how these issues apply in the present case, the parties agree that Missouri law is controlling.

In applying state law, we are bound to apply the law of the state as articulated by the state's highest court.  Baribeau v. City of Minneapolis, 596 F.3d 465, 475 (8th Cir. 2010).  When the state's highest court has not spoken, our job is to predict how the state's high court would resolve the issue.  Id.  We may look to decisions of the state's intermediate courts to the extent they contain sound reasoning, and such decisions may often serve as "the best evidence" of how the highest court would rule. Id.  We, however, are not bound by the decisions of a state's intermediate courts. Lancaster v. Am. & Foreign Ins. Co., 272 F.3d 1059, 1062 (8th Cir. 2001).  As to issues of preclusion or "law of the case" principles stemming from the final judgment in the Coverage Litigation, we "may look to the common law or to the policies supporting res judicata and collateral estoppel . . . ." Allen v. McCurry, 449 U.S. 90, 96 (1980).

The parties present several arguments, some of which can be disposed of easily, see supra notes 1–3.  Regarding KCPL, Travelers alleges a priority interest in the subrogation proceeds relative to KCPL and argues KCPL breached a duty of good faith and fair dealing in failing to protect Travelers's subrogation interest.  KCPL argues primarily that it was entitled to designate and retain its recoveries under the Allocation Agreement as representing uninsured losses and that Travelers possesses no subrogation rights as to these uninsured losses.

-11-

Regarding National Union, Travelers argues that it holds a primary interest in subrogation proceeds and that National Union's subrogation interest is subordinate. Travelers asserts arguments based on policy language, industry standards, and the basic nature of primary and excess insurance coverage. National Union takes the opposite position regarding priority, also asserting arguments based on policy language. Further, National Union argues that because it was not a party to the Travelers policy, it is not required to recognize or respect the subrogation provisions of that policy. In addition, National Union argues Travelers waived arguments based on equitable principles and industry standards by not presenting such arguments in its initial appeal brief. Finally, National Union argues Travelers waived any subrogation interest it may have held by failing to participate in the Allocation Agreement and the Subrogation Litigation. We address the parties' arguments below.

A.    Waiver

1.    Waiver of Subrogation Rights

"Waiver . . . is 'the intentional relinquishment of a known right.' Waiver may be express or it may be implied by conduct that clearly and unequivocally shows a purpose by the insurer to relinquish a contractual right." Shahan v. Shahan, 988 S.W.2d 529, 534 (Mo. 1999) (en banc) (rejecting a waiver argument related to an insurer's defense to coverage) (quoting Brown v. State Farm Mut. Auto. Ins. Co., 776 S.W.2d 384, 386–87) (Mo. 1989) (en banc)). Applying Missouri law, we have stated that a finding of implied waiver is only appropriate where an insurer's conduct is "so manifestly consistent with and indicative of an intention to renounce a particular right . . . that no other reasonable explanation of the conduct is possible." Osborn v. Prudential Ins. Co. of Am., 453 F.3d 1077, 1079 (8th Cir. 2006). Ultimately, "[w]aiver is a question of intention, and is based upon knowledge of the circumstances." Purington Paving Brick Co. v. Metro. Paving Co., 4 F.2d 676, 680 (8th Cir. 1925) (applying Missouri law). It follows from this strict standard that we should interpret waivers narrowly and consistently with the parties' demonstrated

-12-

intentions and not presume that a waiver of some rights necessarily entails a waiver of all related rights. This is especially important in the present context where different rights are conceptually separable, like the right to control or participate in the management of litigation or negotiations as contrasted with the ultimate right to share in a resulting recovery.

Applying this standard, we conclude Travelers waived certain rights by refusing repeated invitations to participate in subrogation discussions, the Allocation Agreement, and the Subrogation Litigation. Those rights include the right to control or participate in the management of claims or litigation against third parties, the decision to settle with most of those parties, and all of the various strategic decisions involved in the litigation against Rockwell Automation. Because suits against third-party tortfeasors in the context of subrogation and recovery actions may not be split and litigated repeatedly, Travelers cannot now pursue third parties separately. See Keisker, 90 S.W.3d at 75; State ex rel. Home Serv. Oil Co. v. Hess, 485 S.W.2d 616, 619 (Mo. Ct. App. 1972) ("The 'splitting' prohibition is designed . . . to avoid harassment of a defendant by a multitude of law suits for damages sustained by the same person from the same tortious act."). By failing to join in KCPL's and National Union's recovery efforts, after repeatedly being invited to do so, Travelers waived its right to direct, control, or subsequently criticize the negotiations and litigation.

Buttressing this conclusion is the fact that no party now suggests Travelers possesses a right to complain about KCPL's and National Union's day-to-day management of the negotiations or litigation with third parties or about the details or dollars involved in the litigation or settlement with third parties.[6]

---

[6]We also believe that by failing to participate, Travelers waived any right to complain about attorney fees and other expenses KCPL and National Union actually incurred en route to obtaining the settlement and judgment from the third parties. We note that Missouri law holds parties sharing in a common fund must share in the expenses laid out to create that fund. See Keisker, 90 S.W.3d 71, 75 (Mo. 2002) ("Where one litigates to create a fund for others, those sharing must contribute a

-13-

Importantly for resolution of the issues at hand, we conclude Travelers also waived any right to challenge the Allocation Agreement's underlying characterization of recoveries as insured or uninsured losses. In the opinion below, the district court noted that Travelers admitted "the typical reason behind an allocation agreement is to allocate between insured loss and uninsured loss." When issuing the initial invitation to discuss subrogation, KCPL stated to Travelers and National Union that it believed it held a right to recovery separate from any insurer's subrogation interests; KCPL believed itself entitled to pursue and retain third-party payments for uninsured losses. In the face of this information, Travelers expressly declined to enter into discussions, refused to enter into the Allocation Agreement, and even after National Union paid its policy limits, refused to join in the Subrogation Litigation against Rockwell Automation.

Travelers, however, did not waive all of its rights. Travelers at no time took actions nor made statements suggesting, much less "manifestly" demonstrating, Osborn, 453 F.3d at 1079, or "clearly and unequivocally show[ing]," Shahan, 988 S.W.2d at 534, an intention to relinquish its right to assert an interest in amounts National Union and KCPL might recover from Rockwell Automation. To the contrary, Travelers stated in the October 13, 2000 letter and again in the August 26, 2002 letter that it reserved its subrogation rights in the event it might make a payment pursuant to the excess policy. Travelers again preserved its subrogation interest as against the Rockwell Automation proceeds in the Settlement Agreement with KCPL. In contrast, through the Settlement Agreement, Travelers expressly and clearly waived

proportional part of the expenses."). We also note, however, that the Travelers policy provides that Travelers's subrogation rights extend to interest and fees. Regardless, the parties have not fully briefed, and we express no opinion regarding, how subrogation expenses should be allocated between Travelers and the parties to the Allocation Agreement. We note only that—regardless of whether and how expenses might ultimately be shared—the underlying decisions by National Union and KCPL to incur those fees and expenses are examples of the litigation-related tactical decisions Travelers left solely to the discretion of National Union and KCPL.

-14-

any subrogation interest as to the first $126 million recovered by KCPL and National Union.

Notwithstanding the reservation of rights by Travelers, National Union argues it would be unjust to permit Travelers to assert a subrogation claim after failing to participate in the subrogation proceedings. In support of its waiver argument, National Union cites Community Title Co. v. Safeco Ins. Co. of America, 795 S.W.2d 453, 461–62 (Mo. Ct. App. 1990), for the proposition that, if an insurer denies coverage, "sits idly by," and permits an insured to pursue and settle a claim against a third-party tortfeasor, the insurer thereby waives its right to insist upon compliance with a subrogation provision. National Union's argument is misplaced as Community Title involved an insurer's attempt to void a policy and avoid payment on a claim rather than a question of subrogation priority. Id. Community Title simply finds no application in the present context.

In Community Title, the insurer refused coverage and the insured, without the benefit of coverage, settled with a third-party tortfeasor and released the third party from all other liability. The insurer later attempted to defend its denial of coverage and avoid payment to the insured by declaring the policy void. In seeking to void the policy, the insurer argued that the insured's settlement with, and release of, the third-party tortfeasor without the insurer's permission violated a no-harm requirement within the policy's subrogation provision. The insurer argued, ultimately, that the insured's release of the third party caused prejudice to the insurer's subrogation rights. The court in Community Title rejected the insurer's attempt to void the policy. 795 S.W.2d at 462. The court held that because the insurer's own actions—the denial of coverage—forced the insured's hand in the dealings with the third-party tortfeasor, the insurer could not use those same actions by the insured as a basis to void the policy. Id. Community Title, however, says nothing about a situation where an insurer reserves the right to participate in subrogation, later pays on the claim, and subsequently attempts to collect a portion of recovered subrogation funds. Even more critically, Community Title says nothing about such a situation where the insured

-15-

itself has expressly designated a portion of the funds recovered from third parties as representing payment for insured losses.

We also note that, even if National Union were correct that the Missouri Court of Appeals decision in Community Title stands for the broader proposition that insurers lose all subrogation rights by failing to immediately pay claims and participate in subrogation litigation, the Community Title decision is not in accord with the bulk of Missouri authority.  In several Missouri cases distinguishing between subrogation rights and assignment rights, the Missouri Supreme Court has emphasized that, with subrogation rights, the insured maintains legal title to the right to sue third parties and sole authority to maintain such suits, and the insurer holds only the right to later assert a claim against proceeds recovered.  See Keisker, 90 S.W.3d at 74 ("The exclusive right to pursue the tortfeasor remains with the insured, which holds the proceeds for the insurer."); Hagar v. Wright Tire & Appliance, Inc., 33 S.W.3d 605, 610 (Mo. Ct. App. 2000) ("[T]he insured still holds the legal right to the claim, the insurer cannot sue the tortfeasor directly but must wait and assert its subrogation interest against any recovery the insured makes against the tortfeasor.").  Given this state of the law, we find no basis for the assertion that Travelers's failure to join in the litigation and its election to assert its subrogation claim after making payment serves as a waiver of subrogation rights.  See Doss v. Howell-Oregon Elec. Coop., 158 S.W.3d 778, 783 (Mo. Ct. App. 2005) ("[I]n general terms, a failure to intervene by an insurance carrier does not waive its right to reimbursement or subrogation."); Buatte v. Gencare Health Sys., Inc., 939 S.W.2d 440, 443 (Mo. Ct. App. 1996) ("[Insurer] did not waive its subrogation/ reimbursement rights by failing to intervene in the . . . action against [the tortfeasor]."); see also 16 Lee R. Russ, Couch on Insurance § 224.155 (3d ed. 2010) ("It has been held that an insurer does not waive its subrogation rights by failing to intervene in an insured's action against a tortfeasor, where there was no requirement to intervene."); id. § 224.156 (stating that not only is there no abstract duty to intervene, but an insurer may, in some instances, even take reasonable positions in opposition to the insured without waiving its subrogation rights).

2.      Waiver of Arguments on Appeal

At the district court level, Travelers claimed that it was "entitled to priority of recovery" against National Union's share of the subrogation proceeds based on the terms of the primary and excess policies, "equitable principles," and "industry standards." National Union argues that Travelers waived the latter two issues (equitable principles and industry standards) because, according to National Union, the issues do not appear in Travelers's opening appellate brief. We disagree and find Travelers more than adequately raised the issue of industry standards in its opening brief. We also find that, in the circumstances presented, the arguments based on industry standards are intertwined with and are not separable from equitable concepts.

Travelers argues throughout its opening brief that it is entitled to a "priority of recovery." It asserts that National Union acted without regard to Travelers's rights when National Union took and retained subrogation proceeds. Travelers presents ample authority from courts and scholars discussing the fundamental nature of excess and primary insurance, the relative duties of excess and primary insurers in the payment of claims, and the relative rights of excess and primary insurers in the context of subrogation. See, e.g., Century Indemn. Co. v. London Underwriters, 12 Cal. App. 4th 1701, 1709–10 (Cal. Ct. App. 1993) (holding that where an insured enters into an excess policy granting the excess insurer priority in subrogation proceeds, the primary insurer must honor the insured's contract obligation as expressed in the excess policy); Vesta Ins. Co. v. Amco Prods. Co., 986 F.2d 981, 988 (5th Cir. 1993) ("Where the insurers' coverage is in the nature of layers, the excess carrier should recover under subrogation before primary insurers can be reimbursed.") (quoting 16 Lee R. Russ, Couch on Insurance § 61.48 at 133 (2d ed. 1983)); Fluor Austl. Pty. Ltd. v Allianz Global Risk U.S. Ins. Co., 234 F. App'x 579, 580 (9th Cir. 2007) ("[S]ubrogation proceeds should be allocated to insurers in the order opposite to that in which they contributed to a settlement payout. . . . [T]raditional insurance principles and considerations of equity . . . dictate top-down allocation in accordance with the levels of risk exposure for which the various insurers bargained.") (internal citation omitted).

Through Travelers's own statements, its references to authority, and its discussion of that authority, the issue of industry standards permeates the portion of Travelers's opening brief directed towards the relative priority of Travelers and National Union. National Union's arguments to the contrary focus largely on the labels employed in Travelers's brief rather than the content of the arguments. Travelers plainly did not waive any issues or arguments surrounding industry standards or the nature of excess and primary coverage.

Regarding a possible waiver of "equitable principles," our decision today does not rest on any such principles standing alone; the subrogation rights in this case are contractual in nature and Travelers's claim that National Union must disgorge funds is inextricably linked to Travelers's arguments regarding industry standards and practices and the basic nature of excess and primary insurance. As such, in this case, we need not determine whether Travelers waived any specific or wholly separate issues or arguments based on equitable principles.

That having been said, the origins of subrogation, in general, are equitable in nature. Given this fact we view with skepticism arguments that a party asserting any subrogation-based claim could at the same time entirely waive equitable principles. This is true even where the asserted subrogation-rights are contractual in nature (unless, of course, the contract rights at issue are unusual and contrary to established equitable principles). See, e.g., Universal Title Ins. Co. v. United States, 942 F.2d 1311, 1314 (8th Cir. 1991) (noting that where the government in the district court "essentially addresssed the issue of whether the equities supported [the plaintiff's subrogation claim]" the district court arguments were "broad enough to encompass all of" the government's subrogation-related arguments on appeal); id. ("The real question should be whether the new argument is such as to raise a new issue . . . . [I]t would be in disharmony with one of the primary purposes of appellate review were we to refuse to consider each nuance or shift in approach urged by a party . . . .") (quoting In re Osweiler, 346 F.2d 617, 621 (C.C.P.A. 1965)); Anison v. Rice, 282 S.W.2d 497, 503–04 (Mo. 1955) (noting that common-law or equitable subrogation rights may not

supercede contractual rights "where it would be inconsistent with the terms of the contract").

Turning to the substance of Travelers's claims, we first address the claims against KCPL.

B.    Subrogation/Priority as to KCPL

1.    Priority According to the Travelers Policy and Missouri Law

Our starting point is to determine what issues have been resolved by the final judgment from the Coverage Litigation involving Travelers, KCPL, and National Union and to look at the impact of our conclusions regarding waiver. The district court in the Coverage Litigation determined KCPL was entitled to determine the character of proceeds obtained from third parties because KCPL suffered uninsured losses as well as insured losses. The district court further determined that KCPL effected an apportionment of recoveries as between insured and uninsured losses by executing the Allocation Agreement. National Union subsequently exhausted its policy limits and was released from the Coverage Litigation, and KCPL and Travelers sought and obtained the entry of a final judgment. No party appealed.

Given these facts, it is appropriate to consider the apportionment of recoveries as representing insured or uninsured losses as the established law of the case. See Little Earth of the United Tribes, Inc. v. U.S. Dep't of Hous. & Urban Dev., 807 F.2d 1433, 1440–41 (8th Cir. 1986) (noting that because no party had appealed from an earlier order in the case and because the parties had expended considerable sums in reliance on the order, it would not be appropriate to revisit the issues expressly and implicitly decided in the order). In Little Earth, the court characterized the law-of-the-case doctrine as discretionary and noted the purpose of the doctrine was to "protect[] the settled expectations of parties, ensuring uniformity of decisions, and promoting judicial efficiency." Id. at 1441. The court examined these purposes as well as the

absence of any changed conditions after the initial order in deciding to apply the doctrine. Subsequently, we have stated that the doctrine is not applicable to interlocutory orders. See Gander Mountain Co. v. Cabela's Inc., 540 F.3d 827, 830–31 (8th Cir. 2008) (refusing to apply the law-of-the-case doctrine based on a determination implicit in an interlocutory order). Here, however, we view the district court's 2004 order regarding the allocation as between insured and uninsured losses as a final order—the parties sought and obtained the ruling as to the impact of the Allocation Agreement for the purpose of defining total insured loss, and subsequently, in reliance on that ruling, resolved the case and obtained the final entry of judgment.

Even if we were to view the dispositive order from Coverage Litigation as interlocutory, however, we would reach the same result. As concluded above, Travelers waived any right to contest KCPL's designation of its own recovery as representing uninsured losses. Travelers refused to participate, permitted KCPL and National Union to incur expenses in pursuit of recoveries, and knew the purpose of the Allocation Agreement was to designate recoveries as representing insured or uninsured losses. As such, Travelers cannot now deny that the funds KCPL retained as per the Allocation Agreement represent uninsured losses.

Given this state of affairs, the question we must address is whether, under Missouri law and according to the terms of the Travelers policy, an excess insurer may assert a subrogation claim against funds that an insured received from third-party tortfeasors and that represent uninsured losses. A plain language interpretation of the subrogation provision in the Travelers policy demonstrates KCPL is not bound by any contract language to remit to Travelers any such specifically designated proceeds. The relevant subrogation provision contains two sentences pertinent to our analysis:

> The Travelers may require from the Insured an assignment of all right of recovery against any party *for loss* to the extent that *payment therefor* is made by the Travelers. The Travelers shall be entitled to priority of recovery against such third party (including interest) *to the extent*

*payment has been made to the Insured*, plus attorney's fees, expenses or costs incurred by The Travelers.

(Emphasis added).  Because the only recovery obtained and retained by KCPL represents uninsured losses—losses for which, by definition, Travelers made no payment—we find within the quoted language no contractual obligation for KCPL to pay Travelers these retained funds.  See generally, 16 Lee R. Russ, Couch on Insurance §§ 226:36–40 (3d ed. 2010) (discussing generally the requirement that recoveries correspond to losses for which the insurer made payment before the insurer may assert a subrogation right as against those recoveries).

Regarding Missouri law, we find an older case to be directly on point and a more recent case to be consistent and instructive.  In Union Trust Co. v. Wyatt, 58 S.W.2d 708 (Mo. 1933), the Missouri Supreme Court held that where a bank suffered total losses of $18,300 due to an employee's malfeasance and was insured on a fidelity bond for $10,000, the bank was entitled to credit sums obtained from the wrongdoer against the $8,300 of uninsured loss.  See id. at 713 ("[C]ertainly the bank would have the right in the absence of any specific designation otherwise to credit same upon either his notes, cash items, *or that part of his defalcations in excess of the amount covered by the contract of indemnity insurance . . . .*") (emphasis added).  In so holding, the court looked at intent as to the manner of crediting the payment:

> As we have pointed out, the . . . payment was applied on that part of the defalcations in excess of, and not covered by, [the insurer's] contract of insurance. [The insurer] now claims it is entitled to be credited with this . . . payment.  There is not a scintilla of evidence to indicate that the payment was so intended, and we are unable to discover any tenable theory supporting appellant's claim.

Id. at 712.  Union Trust, then, stands for the proposition that an insured may designate a recovery as representing insured or uninsured losses *and* may retain sums designated as uninsured without crediting the same towards the insurer.

-21-

Much more recently the Missouri Supreme Court faced a situation where an insured had suffered several categories of loss, including business-interruption losses, in excess of policy limits. See Keisker v. Farmer, 90 S.W.3d 71,73–74 (Mo. 2002) (En banc). There, the insurer paid approximately $127,000 for damage to a building and personal property and $15,000 for lost income and profits. The policy provided only $15,000 in coverage for business-interruption losses, so the insurer had paid the coverage limit on that category of loss. Subsequently, the insured, in asserting a claim against a third-party tortfeasor, sought only damages in the form of lost income and profits. Id. The third-party tortfeasor deposited funds with the court, and the insurer intervened asserting a right to the deposited funds. Id. The insured "concede[d] that it would be unjustly enriched if it recovered its first $15,000 in lost profits from both [the insurer] and the [tortfeasor]." Id. at 75. In addition, the insured obtained $6,000 from a separate tortfeasor.

The court, recognizing that the insured was entitled to designate the losses at issue, held, "Assuming the [insured] can prove lost profits of at least $106,000 [the total obtained from third parties], the [insured] is not unjustly enriched in receiving the remaining $85,000 of the interpled funds." Id. The insurer complained that the insured should not be allowed to limit its request for damages against the third party only to lost profits and income, but the court rejected this argument. Ultimately, the Missouri Supreme Court remanded the case for trial regarding proof of the alleged lost income and profits in excess of $15,000. The remand, however, in no manner impacts the holding: the Missouri Supreme Court recognized that an insured is entitled to designate the nature of a recovery from a third-party as representing uninsured loss. This is precisely the position KCPL adopted in entering into the Allocation Agreement.

Travelers spends the majority of its brief on appeal discussing the applicability of the "made-whole doctrine" and the question of whether the Missouri Supreme Court, if faced with the question, would adopt this doctrine. In general terms, the made-whole doctrine provides that an insurer who has paid a claim is not entitled to

recover proceeds in subrogation until the insurer's payment to the insured, plus the insured's recovery from third parties, has completely compensated the insured for all losses—insured and uninsured. See, e.g., 16 Lee R. Russ, Couch on Insurance § 223.133 (3d ed. 2010) (describing "the traditional equity principle that the insured is entitled to be made whole before the insurer recovers on its subrogation claim"). As such, the made-whole doctrine is a default rule of sorts that characterizes all recoveries from third parties as representing uninsured losses until such time that the insured is made whole. Only after the insured party achieves this level of compensation would the made-whole doctrine permit the characterization of additional recovered proceeds as representing insured losses and make such losses available for subrogation claims from insurers. See generally, John D. Ingram, Priority Between Insurer and Insured in Subrogation Recoveries, 3 Conn. Ins. L. J. 105, 112–15 (1996).

We find questions regarding the made-whole doctrine to be somewhat immaterial in the context of the present case. The procedural history of the present matter has already resulted in the clear and settled identification of KCPL's portion of the recovery as representing uninsured proceeds. It has also resulted in the clear identification of proceeds held by National Union as representing insured losses. Where the characterization of the proceeds is accomplished by agreement, as in this case, or by other means (such as through some form of waiver or by a separate final judgment), or where the nature of the losses and recoveries are such that certain recoveries match certain losses, there simply is no need to resort to the application of a potential default rule such as the made-whole doctrine.

Here, for whatever reasons—uncertainty as to how Missouri might treat the rule, uncertainty as to likely expenses and the likelihood of success in actions against third parties, and uncertainty as to KCPL's own ability to prove its damages—KCPL already elected to declare a substantial portion of the recovered funds as representing insured losses. Given the scale of the total loss incurred, the made-whole doctrine seemingly would not have required KCPL to designate any of the recovered funds

towards insured losses. Regardless, it has done so. We should not now attempt to predict how a state court might deal with the default "rule" of the made-whole doctrine when the events in the present case have obviated the need to resort to any such default rule.

### 2. KCPL's Duty to Not Harm Travelers's Subrogation Interests

Resolution of the priority question does not fully address all of Travelers's claims against KCPL. Travelers also asserts that KCPL owed Travelers a separate duty not to harm Travelers's subrogation interests and that KCPL breached this duty. The subrogation provision of the Travelers policy provides, "Each insured agrees to assist and cooperate with The Travelers in any subrogation proceedings which it initiates and to do nothing after a loss to prejudice The Travelers subrogation rights." Travelers argues specifically that KCPL prejudiced Travelers's subrogation rights by initially entering into the Allocation Agreement apportioning insured losses to National Union and subsequently permitting the dispersal of recovered funds to National Union. Regarding the agreement to apportion funds, we believe any such arguments are subsumed by our prior discussion: Travelers cannot now argue that KCPL acted improperly by entering into the Allocation Agreement, and KCPL was entitled to designate and retain funds as representing uninsured losses. Regarding the potential breach of a duty towards Travelers through the dispersal to National Union of funds representing insured losses, we could only find Travelers's claim *against KCPL* to have merit if we first found that (1) Travelers held a priority interest over National Union, and (2) dispersal of the funds representing insured proceeds caused prejudice to Travelers.

Because we address priority as between Travelers and National Union below in relation to Travelers's claims against National Union, we do not do so separately here. We conclude in our analysis below that Travelers holds a priority interest relative to National Union for several reasons, primary among which is the fact that National Union's subrogation rights are limited to only those rights held by KCPL, and

-24-

KCPL bound itself by contract with Travelers to grant priority in insured proceeds to Travelers alone.

This means Travelers's claim against KCPL based on the duty not to harm Travelers's subrogation interest turns on the question of prejudice to Travelers caused by payment to National Union. In this regard, we note that Travelers seeks only one recovery—reimbursement for its $10 million payment. Because we hold below that National Union is bound to respect Travelers's priority and because no party suggests National Union is incapable of disgorging the improperly received funds, the present case does not demonstrate any prejudice to Travelers (other than protracted transaction and litigation expense). Were National Union defunct, illiquid, or bankrupt, there might be merit to such a prejudice argument. No party, however, makes assertions in this regard.

### C.      Subrogation/Priority as to National Union

#### 1.      Industry Standards

Although our resolution of this issue turns on policy language and Missouri's recognition that a subrogee's rights are limited to those rights held by the subrogor, we are compelled to discuss the basic industry practices as set forth, in part, in the ample authority presented by Travelers. The industry practice, in short, is that excess carriers are the last insurers obligated to pay claims and the first insurers entitled to recover in subrogation. See, e.g., Century Indemn. Co., 12 Cal. App. 4th at 1709–10; Vesta Ins. Co., 986 F.2d at 988 ("'Where the insurers' coverage is in the nature of layers, the excess carrier should recover under subrogation before primary insurers can be reimbursed.'") (quoting 16 Lee R. Russ, Couch on Insurance § 61.48 at 133 (2d ed. 1983)); Fluor Austl. Pty. Ltd., 234 F. App'x at 580; Westchester Fire Ins. v. Heddington Ins. Ltd., 883 F. Supp. 158, 167 (S.D. Tex. 1995), aff'd, 84 F.3d 432 (5th Cir. 1996) ("Money recouped by insurers after paying a claim is first applied to the highest layer of coverage . . . ."); id. at 162, 164 n.11 ("Where there is apparent

conflict between . . . policies, courts should resolve disputes among the carriers by looking to the overall pattern of insurance coverage" and by "considering the contracted-for risks.").

Insurers know and understand this apportionment of risk among fellow insurers, and they price their insurance accordingly, as was done in this case. In cases where insurers who have contracted to provide primary coverage seek to avoid primary liability either by refusing to pay or asserting priority over excess carrier's subrogation interests, courts have rejected such attempts and have cited the need to ensure that insurers are held to bear the actual risks they contracted to accept. See Horace Mann Ins. Co. v. Gen. Star Nat'l Ins. Co., 514 F.3d 327, 337 (4th Cir. 2008) (holding that, as between a true excess policy and primary policy, the critical inquiry "was premised on the nature of the policies at issue, not on the language of the other-insurance clauses"); Fluor Austl., 234 F. App'x at 580 ("subrogation proceeds should be allocated to insurers in the order opposite to that in which they contributed . . . *in accordance with the levels of risk exposure for which the various insurers bargained*") (emphasis added); Smith v. Wausau Underwriters Ins. Co., 977 S.W.2d 291, 294 (Mo. Ct. App. 1998) ("A primary insurer cannot use an 'other insurance clause' to require an umbrella carrier to share in its liability.").

As in most matters, of course, clear contract language could override any concepts such as industry standards, but no such language exists in this case. As such, we cannot read these commercial insurance contracts in a vacuum; where terms have meanings generally understood within an industry, we will not give these terms different meanings unless the parties have unambiguously and expressly done so in their contract language. Sonoma Mgmt. Co. v. Boessen, 70 S.W.3d 475, 481 (Mo. Ct. App. 2002) ("Where a contract term is susceptible to multiple definitions, it should be interpreted in the context of the subject matter of the contract . . . and given its plain meaning.") (internal quotation and citation omitted).

Against this backdrop, we conclude that the Travelers policy unambiguously grants sole priority in insured proceeds to Travelers and that National Union is bound to the Travelers policy as a subrogee of KCPL who holds only the rights of, and is subject to the contractual restrictions upon, KCPL. We also conclude that the National Union policy itself is consistent with this conclusion because, at best, it is ambiguous regarding the priority of recovery between primary and excess insurers.

To explain these conclusions, we turn first to the language of the two policies.

## 2. Policy Language

National Union asserts what it describes as a plain-language interpretation of the insurance policies at issue in this case, concluding that it, rather than Travelers, possesses a priority subrogation interest. Travelers, similarly, asserts a "plain language" argument but reaches the opposite conclusion. In addition to their respective interpretations of the policies, the parties disagree as to the applicability and substance of underlying state law regarding subrogation as well as whether National Union is bound by any terms of the Travelers policy.

In interpreting policy language, we read the relevant provisions, each in the context of its corresponding insurance policy as a whole, giving meaning to each provision and eliminating surplusage and internal contradictions where possible. See Rice v. Shelter Mut. Ins. Co., 301 S.W.3d 43, 47 (Mo. 2009) (en banc); J.E. Hathman, Inc. v. Sigma Alpha Epsilon Club, 491 S.W.2d 261, 264 (Mo. 1973). Also, we apply "the meaning which would be attached by an ordinary person of average understanding if purchasing insurance." Seeck v. Geico Gen. Ins. Co., 212 S.W.3d 129, 132 (Mo. 2007) (en banc) (internal quotation and citation omitted).[7]

_____

[7]Although we quote selected language from both policies in our discussion, we present here the full text of the relevant provisions including the subrogation provisions from both policies as well as provisions in the National Union policy

expressly authorizing KCPL to obtain excess insurance as well as additional contributing primary-layer insurance.

Regarding contributing insurance, the National Union policy provides:

> Permission is granted for other policies written upon the same plan, conditions, and provisions as those contained in this policy.

> This policy will contribute to the total of each loss otherwise payable herein to the extent of the participation of this policy in the total limit of liability as provided by all policies written upon the same plan, conditions and provisions as those contained in this policy.

Regarding excess insurance, the National Union policy provides:

> Permission is granted the Insured to have excess insurance over the limit of liability set forth in this policy without prejudice to this policy, *nor will the existence of such insurance, if any, reduce any liability under this policy.*

(Emphasis added).

The entire subrogation provision of the National Union policy is as follows:

> If the Company pays a claim under this policy, it will be subrogated, to the extent of such payment, to all the Insured's rights of recovery from other persons, organizations and entities. The Insured will execute and deliver instruments and papers and do whatever else is necessary to secure such rights.

> The Company will have no rights of subrogation against:

> > A)   any person or entity, which is an Insured under the Policy;
> > B)   any other person or entity, which the Insured has waived its right of subrogation against in writing before the time of loss.

-28-

a.     The Travelers Policy

We address this policy first because its subrogation provision is unambiguous. As quoted supra note 5, the relevant sentence of the subrogation provision states, "The Travelers shall be entitled to priority of recovery against any such third party (including interest) to the extent payment has been made to the Insured, plus attorney's fees, expenses or costs incurred by The Travelers."   The quoted passage is

The Insured will act in concert with the Company and all other interests concerned, in the exercise of such rights of recovery.

If any amount is recovered as a result of such proceedings, the net amount recovered after deducting the costs of recovery will accrue first to the Company(ies) involved in proportion to their respective interests. Any excess of this amount will be remitted to the Insured.  If there is no recovery, the interests instituting the proceedings will bear the expense of the proceedings proportionately.

The insured will do nothing after loss to prejudice such rights of subrogation.

The  subrogation provision of the Travelers policy provides:

SUBROGATION – This insurance shall not be invalidated should the Insured waive by specific written agreement prior to a loss any or all right of recovery against any party for loss insured against by this policy. Each insured agrees to assist and cooperate with The Travelers in any subrogation proceedings which it initiates and to do nothing after a loss to prejudice The Travelers subrogation rights.  The Travelers may require from the Insured an assignment of all right of recovery against any party for loss to the extent that payment therefor is made by The Travelers. The Travelers shall be entitled to priority of recovery against any such third party (including interest) to the extent payment has been made to the Insured, plus attorney's fees, expenses or costs incurred by The Travelers.

unambiguous in that it accords priority to Travelers and Travelers alone. It does not describe a possible class to which Travelers may belong or a group of insurers or interested parties. The policy, as a true excess policy that references the primary insurance, acknowledges the presence of other insurers, but in the face of this recognition, states simply that Travelers is entitled to priority.

National Union argues that a separate sentence within the same paragraph imposes on KCPL a duty to cooperate in recovery proceedings that Travelers initiates, and, therefore, the entire subrogation provision is triggered only if Travelers itself initiates recovery proceedings. We reject this argument for two reasons. First, the policy uses the terms "it initiates" not "Travelers initiates." This use of the pronoun "it" is imprecise, and the sentence containing these terms can just as easily be read to mean "insureds initiates." More importantly, however, we reject National Union's argument as an unnatural reading of the subrogation provision. The subrogation provision sets out rights for Travelers and imposes duties upon KCPL. The separate sentences of the subrogation provision largely stand alone. The only explicit internal reference among the sentences of the subrogation provision is the term "such third parties" found within the actual sentence granting Travelers a right of subrogation. There is no referencing language in any other sentences suggesting a limitation to proceedings initiated by any particular party. National Union's proffered interpretation, then, takes a qualifying term from one sentence dealing with the imposition of a duty upon KCPL and applies that qualifying term in a separate sentence dealing with the grant of a right to Travelers. There is no sensible explanation nor textual basis for doing so.

We also note that National Union's suggested, unnatural reading lacks any reasonable basis in insurance practice. National Union cites no authority suggesting lay persons in general or insurers specifically might read a qualifying term from a cooperation clause into a separate sentence granting a subrogation right. In short, National Union's efforts do not dissuade us from our conclusion that the Travelers policy is unambiguous regarding subrogation and grants sole priority to Travelers.

## B.     The National Union Policy

The provisions of the National Union Policy most pertinent to our discussion are the subrogation provision and two separate provisions authorizing KCPL to obtain excess insurance or additional "contributing" primary-layer insurance.    The contributing primary-layer insurance provision states that if KCPL obtains such insurance, National Union is obligated to join contributing primary-layer insurers in paying claims in proportion to the amount of primary insurance provided by each contributing insurer.    The excess-insurance clause, in contrast, does not discuss insurers joining together to make proportionate payments of shared obligations. Rather, the excess insurance provision states that if KCPL obtains excess insurance, National Union agrees the existence of such insurance will not reduce any of National Union's liability under the policy.

Read in combination, these separately styled provisions authorizing KCPL to obtain excess and contributing insurance show that National Union recognizes a distinction between true excess policies, on the one hand, and contributory or additional primary-layer coverage, on the other.  National Union may effectively have its own liability reduced by sharing primary-layer coverage with other primary insurance that KCPL may elect to purchase, but National Union may not use the existence of any excess insurance as a tool to reduce National Union's own liability. Further, because National Union expressly authorized KCPL to obtain both types of additional insurance and did not in any manner limit that right to obtaining such insurance from National Union or entities related to National Union, the policy anticipates the possibility of insurance from other companies.

We read the excess-insurance clause as mirroring the standard industry practices described above in that, by disavowing an ability to reduce National Union's own liability due to the possible existence of excess insurance, the National Union policy implicitly recognizes that excess insurers are the last insurers obligated to pay claims and also the first insurers entitled to recover proceeds that are obtained from

third parties and represent insured losses. In other words, any reading of the actual subrogation provision that would place excess insurers' subrogation rights on par with, or subordinate to, National Union's own subrogation rights would impermissibly make the liability limitation provision of the excess-insurance provision surplusage. Farmland Indus., Inc. v. Republic Ins. Co., 941 S.W.2d 505, 510 (Mo. 1997) (en banc) ("[E]very clause must be given some meaning if it is reasonably possible to do so.") (citation omitted). Through the excess-insurance provision, National Union promises not merely to pay claims without reference to the existence of excess insurance, National Union agrees that excess insurance will not "reduce *any* liability under" the policy. (Emphasis added). In effect, this expansive language addresses the concept of net liability—total outlays after subrogation recoveries— and not merely National Union's initial payments of claims.

Reading the National Union policy's subrogation provision against this backdrop, i.e., in the context of the policy as a whole, we find nothing inconsistent with awarding a priority subrogation interest to an excess insurer. The National Union policy's subrogation provision is, at best, silent as to the relative rights of National Union and excess insurers. The provision grants a subrogation interest "to the extent of" the "payment" of "a claim under" the National Union policy. A subsequent sentence states, "If any amount is recovered . . . the net amount recovered after deducting the costs of recovery will accrue first to the Company(ies) involved in proportion to their respective interests. Any excess of this amount will be remitted to the Insured." Unlike the Travelers policy, which refers solely to Travelers, the National Union subrogation provision does not refer solely to National Union; it refers to a group of entities referred to as "Company(ies)."

We believe there are several possible readings of this provision as "Company(ies) involved" arguably could refer only to National Union and certain National Union affiliates, only to entities actually involved in recovery proceedings, or only to entities involved in the payment of claims to KCPL (National Union and excess insurers or additional, contributing primary insurers). These multiple possible

-32-

readings "create an ambiguity—a duplicity, indistinctness, or uncertainty in the meaning of the language in the policy." Keisker, 90 S.W.3d at 74. As such, we refuse to hold in contravention of industry standards that the National Union policy somehow precludes priority for an excess insurer. Not only does such priority find textual support in the excess-insurance authorizing provision, it can be inferred as a general matter from industry practice, and inferred specifically in this case, by viewing the policy as a whole and acknowledging the relative risks the respective insurers' contracted to accept. See Horace Mann, 514 F.3d at 329 ("primary insurers charge larger premiums for coverage than do excess and umbrella carriers"); id. at 339 (refusing "to insulate [the primary insurer] from the effect of its decision to write a primary liability insurance policy"). Here, for example, National Union priced its primary policy at $850,000 for $200 million of coverage and granted permission for KCPL to obtain excess insurance without reducing any of National Union's liability. Travelers priced the $100 million of excess coverage at $25,000 and asserted an unambiguous limitation on its own liability precluding payment prior to exhaustion of an underlying $200 million primary policy and asserting an unambiguous claim to a priority subrogation interest. This pricing and the bedrock nature of the policies suggests no confusion as to the relative rights and duties of the insurers in terms of payment and subrogation recoveries.

3.     National Union's Subrogation Rights are Subject to Subsequent Agreements Entered into by KCPL, Including Travelers's Policy.

Regardless of any claims to priority found in the National Union Policy, Missouri law requires that National Union, as the subrogee, be bound by limitations KCPL places upon itself as subrogor. Jos. A. Bank Clothiers, Inc. v. Brodsky, 950 S.W.2d 297 (Mo. Ct. App. 1997) ("Bank"), is directly on point. Bank holds that where an insured has a contractual obligation to a party, and an insurer asserts subrogation rights, the insurer merely stands in the shoes of the insured and therefore any claims by the insurer are subject to the contractual duties and limitations that apply to the insured.

-33-

The facts in Bank involved a clothing retailer (Bank) whose shop was flooded and whose landlord was responsible, in part, for the flooding. In the property lease between Bank and the landlord, Bank had agreed to maintain insurance naming the landlord as an additional insured. Bank initially had fulfilled this duty. In obtaining insurance with a different firm for a subsequent year, however, Bank failed to list the landlord as an additional named insured.

When the insurer tried to recover through subrogation in a claim against the landlord, the Missouri Court of Appeals ultimately held the insurer could not recover. The court recognized that the insurer was not a party to the lease agreement and that the landlord was not, in fact, listed as a named co-insured. The court nevertheless applied Missouri's "no subrogation" rule and held that because the insurer could not ignore Bank's contractual relationship with the landlord, the landlord was to be considered a named insured, therefore precluding a subrogation claim. Id. at 302 ("Where an insurance company attempts to recover, as a subrogee, from a coinsured under the policy, whose negligent act occasioned the loss, the claim must fail in the absence of design or fraud on the part of the coinsured."). Although the landlord was not technically a co-insured, the Missouri Court of Appeals held, "The lease provisions for co-insurance bind Bank. [The insurer] as Bank's subrogee, is also bound by a coinsured relationship of Bank and [the landlord]." Id.

The court relied in part on insurance law and held, "Where a party is required by contract to carry insurance for the benefit of another, that party will be treated as a coinsured." Id. at 303; see also Rock Springs Realty, Inc. v. Waid, 392 S.W.2d 270, 277 (Mo. 1965)); Monsanto Chem. Co. v. Am. Bitumuls Co., 249 S.W.2d 428, 431 (Mo. 1952). In the alternative, however, the court relied on simple contract law, stating that Bank's breach of the contractual duty to provide insurance for the landlord precluded suit by Bank against the landlord. The court held, "The subrogee stands in the place of the subrogor. . . . Thus, Bank's breach forecloses its claim against [the landlord] and [the insurer's] claim as Bank's subrogee." Bank, 950 S.W.2d at 303

Applying <u>Bank</u>, we hold that National Union is entitled to exercise only those rights KCPL itself could exercise. KCPL, as a party to the Travelers policy, was bound to recognize the priority of Travelers's subrogation claim as against insured proceeds. Regardless of any arguments National Union may present based upon purported priority as established through its own policy, it cannot ignore KCPL's own contractual duties toward Travelers when standing in KCPL's shoes. <u>See</u> <u>Century Indemn. Co. v. London Underwriters</u>, 12 Cal. App. 4th 1701, 1709 (Cal. Ct. App. 1993) (applying California law consistent with Missouri law and holding a primary insurer, as the subrogee of the insured, "had no greater rights than [the insured] itself and thus was bound by the agreement that [the insured] had made with [the excess insurer]").

National Union argues against this position and against the holding of <u>Bank</u> and <u>Century Indemnity</u> and cites cases generally for the proposition that contracts bind only the parties to the contract. <u>See, e.g.</u>, <u>EEOC v. Waffle House, Inc.</u>, 534 U.S. 279, 293 (2002) ("It goes without saying that a contract cannot bind a nonparty."); <u>In re Exec Tech Partners v. Resolution Trust Corp.</u>, 107 F.3d 677, 680 (8th Cir. 1997) (applying Missouri law). These cases espouse a fundamental and unobjectionable aspect of contract law. They do not defeat our analysis, however, because as a subrogee, National Union's claim of right to the contested proceeds for insured losses can be no greater than KCPL's rights. KCPL is a party to the Travelers policy and KCPL's rights are precisely the contract rights under examination. Here the critical inquiry is whether Traveler's holds a priority interest or whether National Union, when standing in KCPL's shoes, holds the greater interest.

National Union also cites a Missouri Court of Appeals case involving a recording statute and subrogation provisions in a series of loan documents and deeds of trust. <u>See</u> <u>Kansas City Downtown Minority Dev. Corp. v. Corrigan Assocs.</u>, 868 S.W.2d 210 (Mo. Ct. App. 1994). As an initial matter, we reject National Union's assertion that we are bound by <u>Corrigan</u>; we are not bound by the decisions of a state's intermediate courts. <u>Swope v. Siegel-Robert, Inc.</u>, 243 F.3d 486, 496 (8th Cir. 2001).

Further, <u>Corrigan</u> is factually distinguishable as it involved recording statutes and subrogation in the context of deeds of trust and multiple loan agreements; it did not involve questions of subrogation priority as between primary and excess insurers.

In <u>Corrigan</u>, the court held that a subordinate lender, whose lien was extinguished upon foreclosure by the primary lienholder, could not recover from the primary lienholder because (1) the recording statutes did not permit recognition of the subordinate lender's assertion of priority, and (2) the evidence did not show an intent among the parties to accord priority to the subordinate lender. If anything, the material holding we should take from <u>Corrigan</u>, then, is not that a subrogee is free from the contractual limitations of the subrogor. Rather the material point is that it is necessary to examine the intent of the parties in the apportionment of rights. In this case, that necessarily entails an examination of the risks the different insurers contracted to insure. Contrary to National Union's arguments, then, <u>Corrigan</u> affords National Union no shelter from Travelers's priority claim.

Finally, we note that the district court in the present case discussed the inherently limited nature of subrogation rights and found no duty for National Union to make a payment to Travelers. The court, discussing <u>Great Atl. Ins. Co. v. Liberty Mut. Ins. Co.</u>, 576 F. Supp. 561, 564 (E.D. Mo. 1983), stated:

> The court held that even assuming the excess carrier was subrogated to the rights of the insured, the excess carrier had no right to collect additional money from the primary carrier. . . . The same is true here. KCP&L has no legal right to collect additional money from National Union; therefore, even were Travelers to stand in KCP&L's shoes, Travelers would have only the rights possessed by KCP&L, which do not include the right to collect an additional $10 million from National Union.

We disagree that <u>Great Atlantic</u> is applicable to the present situation. <u>Great Atlantic</u> is distinguishable because it involved an attempt to force a primary insurer

to pay on a policy that did not cover the loss at issue. Here, Travelers seeks only the recognition of its priority subrogation rights as to the proceeds from the Rockwell Automation judgment, not additional payment beyond the policy limits by National Union.

Great Atlantic involved mistakes of fact and mutual mistakes between contracting parties, and, as the court in Great Atlantic summarized, one party was trying to profit by another's inadvertent mistake. Id. at 565 ("The sum and substance of the foregoing is that Great Atlantic is seeking to profit by the inadvertent mistake of Liberty Mutual for the purpose of obtaining money to which it is not entitled. The evidence admits of but one conclusion, namely, that Great Atlantic is not entitled to recover against Liberty Mutual."). In Great Atlantic, a primary insurer inadvertently wrote two $500,000 policies that covered risks in the United States as well as Canadian risks even though the insured and the primary insurer clearly had intended one policy to cover domestic risks and the other to cover Canadian risks. Ultimately, the primary insurer made a payment of the policy limits on the policy the parties had intended to cover domestic risks. An excess insurer then made a payment on an excess policy for an amount less than $500,000. After making its payment, the excess insurer sought to recover the amount of its payment from the primary insurer. The excess insurer argued that the primary insurer should have to pay under the Canadian-risk policy that had mistakenly been written to include domestic risks.

The court refused to order additional payment. The court held that, contrary to the mutual mistake of the primary insurer and the insured, the evidence established that the primary insurer and the insured had intended there to be only $500,000 of primary coverage for domestic risks. The court then held that, because the insured itself had no right to recover additional funds from the primary insurer, the excess insurer, through subrogation, could not recover additional money from the primary insurer.

Great Atlantic, then, is wholly distinct from the present case. There the excess insurer was not asking for subrogation recoveries held by a primary insurer to be disgorged in favor of an excess insurer with a superior subrogation right. Further, we believe Great Atlantic stands for the proposition that the parties' intent matters and insurers should be held to pay for the risks they contracted to accept. Importantly, even if Great Atlantic were applicable here, the question in the present case is not whether National Union owes KCPL some additional amounts under some unexhausted National Union policy. The question is simply whether, in the distribution of the proceeds from the Rockwell Automation judgment, the parties honored KCPL's contractual duties to Travelers or whether funds were improperly diverted and should be disgorged by National Union to Travelers, the party with the priority interest. We conclude that National Union, like KCPL, was bound to recognize Travelers's priority interest and must now disgorge $10 million from its 55% share of the $97 million judgment against Rockwell Automation.[8]

III.   Conclusion

We affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

————————————————

[8]Subject to any adjustments for interest, fees, expenses, etc., as to be determined.

-38-